The judgment in the court below being erroneous, it must be reversed.

ROCKWELL, J., dissented from so much of the above opinions as relates to the unconstitutionality of the act. (See next case.)

Judgments reversed.

[DUTCHESS GENERAL TERM, July 21, 1855. *Brown, S. B. Strong* and *Rockwell*, Justices.]

---

THE PEOPLE, on the complaint of JOHN E. VASSAR, *vs.* PHILIP BERBERRICH.

Where an individual is brought before a magistrate, upon a warrant issued for a violation of the act of April 9, 1855, " for the prevention of intemperance, pauperism and crime," the magistrate should take his examination; and if, upon such examination, it appears that no offense has been committed, or that there is no probable cause for charging the accused therewith, he should be discharged. If there is probable cause to believe the defendant guilty, bail should be taken, if offered by the defendant, for his appearance at the next court having cognizance of the offense.

The legislature did not intend, by that act, to extend the jurisdiction of courts of special sessions so far as to compel persons accused of offenses against the act, to submit to a trial before that tribunal in cases where the accused should offer bail for their appearance at the next court of sessions or oyer and terminer at all events.

A court of special sessions is one of limited jurisdiction, deriving all its power from the statute. It can only acquire jurisdiction over the person of the accused upon his request to be tried before it, or his omission, for 24 hours after being required to do so, to give bail for his appearance according to law.

CERTIORARI to a court of special sessions held by the county judge of Dutchess county, to remove a conviction of the defendant, for a violation of the prohibitory liquor law, in selling intoxicating liquor.

The People *v.* Berberrich.

*T. C. Campbell* and *John Thompson*,.for the people.    I. In deciding the case and determining what ought to be done, the rules as to habeas corpus apply fully to certiorari.  (2 *R. S.* 564.)

II. No person can sue out this writ, except he is committed, detained, confined, or in some way actually restrained of his liberty.    If his object is to review the proceedings of courts, or the sufficiency of papers, his remedy is by appeal or common law certiorari.  (2 *R. S.* 564, § 35.    *Mercein* v. *The People,* 25 *Wend.* 89.    3 *Hill,* 399.)

III. Nothing can be reviewed on this writ except the sufficiency of the warrant, and whether the county judge had colorable authority to issue it; and the fact whether the law is constitutional cannot properly be decided here by this court.  (*In the matter of Prime,* 1 *Barb. S. C. R.* 340, *&c.    People* v. *Cassels,* 5 *Hill,* 167, 168.    *Note to* 3 *Hill,* 659.    *Bennac* v. *The People,* 4 *Barb.* 33.)

IV. Is the law constitutional under which the county judge proceeded and the warrant was issued ?    1. The power to make laws, in this state, is exclusively in the legislature.  (*See art.* 3 *of the Constitution,* sec. 1, 1846.    *Also, see art.* 1 *of the same Const. sec.* 17.)    The people can make no law, repeal no law, enact no law ; they have surrendered all their power into the hands and keeping of the legislature.    The people have surrendered their rights as individuals to government, for the purpose of gaining greater rights from government.  (2 *Kent's Com.* 448.)    2. What is the limit of this legislative power ?    We say there is no limit, except the constitution.    This must of necessity be so in all constitutional governments.    The legislature are made the judges of the expediency of a law, and are quite as good judges as the people at large.    *The judiciary are never to judge of the expediency of a law.*  (2 *Kent,* 448.    *Butler* v. *Palmer,* 1 *Hill,* 329.    *Charles River Bridge* v. *Warren Bridge,* 11 *Pick.* 420.    *Cochran* v. *Van Surlay,* 20 *Wend.* 381.)    3. If then this act does not violate some of the express provisions of the constitution of the state of New York, it is a legal and binding act, and the judiciary cannot declare it uncon-

stitutional because it is deemed inexpedient or distasteful to them.

V. The act is said to violate directly the constitution of the state of New York. 1. It deprives the accused of the common law right to a trial by a jury of twelve men. The provision of the constitution of 1846 on this subject is as follows : " The trial by jury in all cases in which it has been heretofore used shall remain inviolate forever." (*Art.* 1, *sec.* 2.) The provision of the constitution of 1822 is as follows, (being the same precisely.) (*See Const. of* 1822, *sec.* 11, *art.* 7.) The provision in the constitution of 1777 is the same in substance. (*See Const. of* 1777, *sec.* 41.) These constitutional provisions following one after the other the same in each constitution in substance, *only preserve this right in those cases in which it has been heretofore used, not in every case,* not in any unless it has been heretofore used. 2. Trial by jury has not been used in this state before the constitution in any cases where the offense was under the grade of grand larceny, till the creation of the court of special sessions in 1824. And these provisions of the constitution are deemed to have been made recognizing that fact. The right therefore of a trial by jury in no case under grand larceny can be claimed as a constitutional right. It has been given as a matter of justice, and a favor on account of our tenderness towards liberty. (*People* v. *Goodwin,* 5 *Wend.* 251. *Murphy* v. *The People,* 2 *Cowen,* 817, *and the statute and decisions there cited.*) 3. The act giving a trial by jury in cases of all misdemeanors, and creating a court of special sessions, was passed in 1834, and the most that could be claimed would be that the right of a trial by jury was secured in such cases by implication. If this is so, the trial by jury secured at the time of the passage of the last constitution.in such cases is given, to wit, a jury of six men. (*In the matter of Newell Smith,* 10 *Wend.* 449. *Cruger* v. *The Hudson River R. R.,* 2 *Kern.* 199.) 4. It is said to violate expressly the provision of the constitution that " no person shall be held to answer for a capital or otherwise infamous crime, unless on presentment or indictment of a grand jury." . We say the crime in question is not an infamous crime.

The People v. Borberrich.

No common law misdemeanor was at common law an infamous crime. This question is forever put to rest by the provisions of our constitution, and the revised statutes. (2 *R. S. p.* 707.) " Whenever infamous crime is used in any statute, it shall be construed as .including every offense punishable with death or by imprisonment in a state prison, and no- other. This same statute (*Id.* 702,) was in force before the adoption of the constitutions of 1822 and 1846, and according to every rule of interpretation of those instruments they must be deemed to have been passed with reference to this statute. This interpretation is strengthened by the fact that the words of the constitution are " capital or otherwise infamous crime." 5. It is said the act itself violates the constitution, and convicts a man of an infamous crime without trying him by a jury, and without giving the benefit of a presentment of a grand jury, by excluding persons from sitting as jurors. This we deny. The provision does not render the person infamous or subject him to a single penalty attached to the conviction of an infamous crime. What are those penalties ? They are, (1.) The person cannot be allowed to testify in a court of justice. (2 *R. S.* 701, § 27.) (2.) He is deprived of the right of suffrage. (1 *R. S.* 4*th ed.* 337.) All other rights, persons convicted of infamous crimes enjoy, with other citizens. This provision, therefore, of excluding certain persons from acting as jurors, does not charge a person with any crime, or hold him to answer for one, in any sense whatever. It merely excludes a man because by interest he is incompetent, and nothing more; a right which the legislature have always had and executed. (*In the matter of Smith*, 10 *Wend.* 449. 20 *John.* 460.) 6. The law is said to be unconstitutional, because a state cannot pass a law prohibiting the sale of personal property. We affirm it is perfectly proper to do so, and that the right exists of necessity in all governments. If it is thus unconstitutional, it must be a violation of the *spirit* of the constitution and not the letter. The constitution does not prohibit the legislature from making illegal the sale of property, in words. The relator claims it is not lawful to pass such an act. (1.) Because it is an infringement of private rights. It does not

The People v. Berberrich.

infringe upon such rights. A man can drink as much as he pleases, and when and where he pleases, under this law. It only prevents one man selling or giving it to another, which is not a private right. The law is a mere police regulation, which every state has a right to make. (5 *How. U. S. Rep.* 573.) All the judges' opinions in the three cases there heard together. (2.) This is not a prohibitory law. It does not prohibit but only regulate and confine the sale. 7. It is insisted that the act violates the constitution of the United States by preventing the sale of imported liquors freely. The United States can only claim the right of a sale by the importer in the original package, and this is secured to him by the present law (*Opinion of Taney, Ch. J., 5 Howard,* 573 *to* 575 ; *of McLean, J., Id.* 589 ; *of Woodbury, J., Id.* 620 ; *of Grier, J., Id.* 631.)

VI. The opponents of the act claim that the exception contained in the 1st section of the act renders the sale of all imported liquors, every where, lawful, and renders it necessary for the prosecution to aver in the complaint that the liquor was not imported. That exception is as follows, viz: "This section shall not apply to liquor the right to sell which in this state is given by any law or treaty of the United States." 1. The fair meaning of these words confines the exception to those cases where some law or treaty of the United States authorizes the sale. 2. As there is no such law or treaty which permits such sale, the section is not altered or affected by the exception. The importer would have a right to sell in the original packages without such exception, and he has it with it. 3. An exception which is not a part of the act itself need not be negatived, in pleading; but to be rendered available must be set up and proved by the party asking its aid. (*Gould's Pl.* 179. *Barb. Crim. Law,* 291.)

*J. F. Barnard* and *H. A. Nelson,* for the defendant.

ROCKWELL, J. The defendant has been convicted before a court of special sessions, held by the county judge of Dutchess county, of having sold intoxicating liquor in violation of the act

for the prevention of intemperance, pauperism and crime, passed April 9, 1855. It is claimed that the defendant should be discharged from custody,

I. Because so much of the said act as prohibits the sale of intoxicating liquor is void. That such prohibition is an unauthorized invasion of private rights, and a violation of the fundamental law. I entertain no doubt that intoxicating liquor is property, and as such is entitled to the protection of law. In my opinion much labor, learning and logic have been wasted in demonstrating a proposition so perfectly obvious.

The right of property is protected against invasion from the legislative, or any other branch of the government, by the express terms of the constitution. (*Constitution, art.* 1, §§ 1, 6.) But aside from this, it is clear that under every free government there are certain fundamental and inherent rights belonging to individuals which are not solely dependent upon the will of the legislature; and it is unnecessary to examine the written constitution of the state to ascertain whether they are expressly shielded by that instrument from legislative encroachment. The right of personal security, of personal liberty, and private property, do not depend upon the constitution for their existence. They existed before the constitution was made, or the government was organized. These are what are termed the absolute rights of individuals, which belong to them independently of all government, and which all governments which derive their powers from the consent of the governed, were instituted to protect. They are defined as follows: "By the absolute rights of individuals we mean those which are so in their primary and strictest sense, such as would belong to their persons merely in a state of nature, and which every man is entitled to enjoy whether out of society or in it." (1 *Black. Com.* 123.)

From the very nature of our government, there must be a limit to legislative power. The ultimate sovereignty of the state is in the people. The government, in all its departments, derives its just powers from the consent of the governed. The powers of the legislature are not original, or inherent, but are

The People v. Berberrich.

wholly delegated to them by the people. These powers must be exercised under such restrictions as are expressly contained in the written constitution of the state, or as are necessarily implied from the nature and object of the trust which has been confided to the legislature by their constituents. It is contended that the powers of the legislature are supreme, except where they are expressly limited by the constitution, because the constitution expressly confers upon the senate and assembly all the legislative power of the state. (*Const. art.* 3, § 1.) But this assumes that there is no limit to the legislative power of a free state. To this I cannot assent. I suppose that the powers of the legislature are necessarily limited to those objects for which the government was instituted, namely, the protection of individuals in the enjoyment of their absolute and inalienable rights; and that a law which arbitrarily and unnecessarily contravenes these objects, and wantonly strikes down private rights instead of protecting them, is beyond the scope of legislative competency, and is void. It is a case where agents have transcended the powers conferred upon them by their principals, and the principals are not bound by their acts. And individuals who are aggrieved through the exercise of such usurped powers by the legislature, are entitled to the protection of the judicial department of the government, whose peculiar province it is, to construe laws and pronounce upon their effect and validity.

But while the absolute rights of individuals are better protected, they are not as entirely absolute under government, as in a state of nature. They are subservient to such measures as become necessary for the preservation of the government, its defense against external or internal enemies, or the promotion of the best interests of the whole community. For the protection of the government against external danger, individuals may be compelled to enter the military service, and to subject and expose themselves to the hardships and perils of war. For the protection of society against the consequences of crime, offenders may be deprived of liberty, property or life. Lunatics who become dangerous to others may be imprisoned. Per-

The People *v.* Berberrich.

sons sick of contagious diseases may be removed to, and placed in, hospitals. Property may be removed or destroyed, or trades suppressed, which endanger the public safety or health. Property may be taken from individuals in the form of taxes, and applied towards the support of the government and its institutions. In short, government is not to be restrained in the exercise of its legitimate powers, which are essential to the public welfare, because the rights of individuals will be injuriously affected thereby.

In cases where private property is directly and specifically taken for the public use, compensation must be made to the owner. But cases are constantly occuring, where individuals are subjected to great and ruinous losses of property through the operation of public measures and laws; but these losses being merely consequential and incidental to the exercise of the legitimate powers of the legislature, the individual injury is not the subject of legal redress. Loss to individuals other than those whose property is directly taken and applied to the public use frequently results from the grading of streets, the construction of canals, bridges, ferries, rail roads and similar improvements; but if the law-making power, in the exercise of its legitimate discretion, decides that such improvements are conducive to the public good, no individual, whose injuries are consequential merely, will be permitted to arrest the action of the government, or will even be entitled to compensation for the injury which he may sustain. (*Radcliff's Executors* v. *The Mayor &c., of Brooklyn*, 4 *Coms. R.* 195.)

We may assume that the legislature of a free state is not competent to pass a tyrannical law. That is, one which restrains the natural rights of individuals, for any other purpose than to advance some public good, or to repress some public evil. The distinction between laws which are tyrannical because they unnecessarily infringe upon the absolute right of individuals, and those which are consistent with civil liberty, although in restraint of natural liberty, is very clearly pointed out by Blackstone, as follows :

" Political or civil liberty which is that of a member of socie-

ty, is no other than natural liberty, so far restrained by human laws (and no further) as is necessary and expedient for the general advantage of the public. Hence we may collect, that the law which restrains a man from doing mischief to his fellow citizens, though it diminishes the natural, increases the civil liberty of mankind; but that every wanton and causeless restraint of the will of the subject, whether practiced by a monarch, a nobility, or a popular assembly, is a degree of tyranny; nay, that even laws themselves, if they regulate and constrain our conduct in matters of mere indifference, without any good end in view, are regulations destructive of liberty; whereas, if any public advantage can arise from observing such precepts, the control of our private inclinations in one or two particular points, will conduce to preserve our general freedom in others of more importance by supporting that state of society which alone can secure our independence." (*Black. Com.* 125.)

The following, among a great multitude of authorities, establish the doctrine that private property is held in subserviency to such laws and measures, as in the exigencies of society become necessary for the promotion of the public welfare. (*Stuyvesant* v. *New York,* 7 *Cowen,* 588. *Vanderbilt* v. *Adams, Id.* 349. *Commonwealth* v. *Dana,* 2 *Metc.* 329. *Mayor &c.* v. *Lord,* 17 *Wend.* 285, 295; *S. C. in error,* 18 *id.* 130. *Stone* v. *Mayor &c.,* 25 *id.* 157. *Russell* v. *Same,* 2 *Denio,* 461.)

There is no doubt but that a great number of individuals will sustain serious loss of property and derangement of business through the operation of the prohibitory feature of the law in question. But this consideration is not decisive of the question of legislative competency. The question still remains; Was the passage of the act an exercise of the legitimate discretion and power of the legislature founded upon considerations of public policy, tending to promote the morals, the health and safety of the community, or was it a mere wanton and unnecessary invasion of the private rights of individuals?

Any interference with the right of property is not the primary object of this law. Its object is to prevent intemperance, pauperism and crime. Surely, these are proper subjects of le-

gislation. A law aiming at the prevention of these evils, by regulating, and to a certain extent prohibiting, the sale of intoxicating liquor, has long existed as one of the police regulations of the state. The present law assumes that the former law has been found insufficient to accomplish the ends for which it was designed. That the regulation of the sale of intoxicating liquor having failed to suppress intemperance, pauperism and crime, and the public evils flowing therefrom, it has become necessary to try what virtue there is in prohibition.

Whether the law can be carried into effect; whether the whole result will not be a mere legislative enactment of prohibition, without the power of enforcing it practically; whether the evils at which the law is pointed will not be aggravated instead of suppressed, are matters addressed solely to the discretion of the legislature, and with which the judicial branch of the government has no concern.

The objects of the law are matters in which the whole community are interested. Drunkards, paupers and criminals are burdens upon the public—enemies to the peace, welfare and happiness of society. Can it be doubted that if the traffic in intoxicating liquor was entirely suppressed, their number would be greatly diminished? It is enough, to uphold this law, that its tendency is to prevent the public evils against which it is directed, and to promote the public benefits which it is designed to reach. It is not difficult, by ignoring the whole object and purpose of the law, to make out a very plausible case of legislative encroachment upon private rights. But this is not a just or fair mode of considering it. The great ends of public policy which it was intended to subserve, are clearly within the scope of legislative competency. The public evils which it was intended to suppress, are the most formidable to the peace and welfare of society which those who make or administer the laws are called upon to encounter. Assuming that the legislature have acted in good faith; that they have not wantonly and unnecessarily invaded private rights, under the mere pretense of preventing public evils; I think the question, whether the public benefits are of greater weight or importance than the

individual losses which will result from the prohibition of the sale of intoxicating liquor as a beverage, is one of legislative discretion, and with which the judiciary has no concern. It was for the legislature to determine to what extent it was necessary to interfere with private rights, in order to accomplish the great ends of public policy which they had in view; to array on the one side the serious loss of property and derangement of business which must ensue from the passage of this law, and on the other the appalling statistics of intemperance, pauperism and crime, and then determine whether the public necessity was sufficiently urgent to justify the individual wrong. It is enough, to uphold this law, that its aims and object are proper subjects of legislation, and that its apparent tendency is to promote these objects. The legislature, in the exercise of a legitimate discretion, have decided that in order to prevent intemperance, pauperism and crime, it was necessary to prohibit the sale of intoxicating liquor as a beverage. Whether such necessity in fact existed, and whether prohibition will accomplish the object which the legislature had in view, may be questionable. But these are questions which the legislature were obliged to determine, and even if they have decided them erroneously no appeal lies from their decision to the judicial tribunals of the state. The errors, if any exist, must be corrected by the people through the ballot boxes. If it was clear beyond question that no such necessity existed, or that the law could not accomplish its professed object, then it would present a case of unnecessary and wanton violation of private rights by the legislature, and the aid of the judiciary might properly be invoked for their protection. But these questions have been publicly and widely discussed, good and wise men have differed in opinion with regard to them. and the legislature have deliberately passed upon them, Their decision, I think, must stand until it is reversed by the people acting through the agency of a subsequent legislature.

But it is further claimed that the defendant should be discharged from custody,

II. Because it does not appear, from the complaint under

The People *v.* Berberrich..

which he was arrested and convicted, that he sold liquor which was not imported. That, by the true construction of the exception at the close of the first section of the act, the unrestricted sale of all imported liquor is permitted. The language of this exception is as follows. "This section shall not apply to liquor, the right to sell which in this state is given by any law or treaty of the United States." It is said, that as this clause occurs in a penal statute, and is a part of the definition of the offense which it is the intention of the law to prohibit and punish, it must be *strictly* construed. This may be so. But a *literal* construction of the clause will render it entirely nugatory. The rights of those whose interests are protected by the exception forbid such a construction. There is no law or treaty of the United States by which the right to sell any description of liquor is *given*, directly or indirectly. The right to sell liquor or other property is not given by any law of the United States or the state of New York. It exists as a necessary incident to the right of property, independently of any positive law. It has been held by the courts of the United States, that the right to sell liquor of a certain description, and in a certain condition, is *secured* by the operation of certain laws of the United States against any restraint of the right of sale by state legislation. That is to say, when the act of congress authorizes the importation of liquor, the right of the importer to sell it, results as a necessary incident to the right to import, and is secured to him against any interference on the part of the state legislature, by the paramount authority of congress. The question then is, what description of liquor is it, the right to sell which, notwithstanding any prohibition by the laws of this state, is derived from or secured by the act of congress? It is imported liquor in the casks or packages in which it was imported. The exception from the prohibition is exactly coextensive with the right to sell secured by the act of congress; and the exception was plainly and solely intended to avoid a conflict between the state and federal laws. Any other construction would be so totally at variance with the whole spirit, scope and intention of the entire law as, in my judgment, to be utterly inadmissible.

The rules by which the sages of the law have ever been guided, in seeking for the intention of the legislature, are maxims of sound interpretation, which have been accumulated by the experience, and ratified by the wisdom of ages. (*Plowden's Rep.* 205.) The resolutions of the barons of the exchequer in *Heyden's case,* were the following : " For the sure and true interpretation of all statutes in general, be they penal or beneficial, restrictive or enlarging of the common law, four things are to be discerned and considered. 1. What was the common law before the making of the act? 2. What was the mischief and defect against which the common law did not provide? 3. What remedy the parliament hath resolved and appointed to cure the disease of the commonwealth? 4. The true reason of the remedy. And it was held to be the duty of the judges at all times to make such construction as should suppress the mischief and advance the remedy, putting down all subtle inventions and evasions for continuance of the mischief, *et pro privato commodo,* and adding force and life to the cure and remedy according to the true intent of the makers of it, *pro bono publico.*" (3 *Reports,* 7.) Surely we are not called upon to reverse these admirable rules for the construction and interpretation of statutes, and so to construe this act as will certainly and clearly advance the mischief which it was intended to suppress, and suppress the remedy which it was intended to advance.

It is further claimed that the defendant is entitled to his discharge,

III. Because the proceedings against him were in violation of law, and void. I can perceive no substantial error in these proceedings down to the time when the defendant was brought before the county judge upon the warrant issued by that magistrate for his arrest. He then demanded that his examination should be taken, and offered bail for his apperance at the next court of sessions for Dutchess county. This was refused, and he was thereupon tried and convicted before a court of special sessions held by said county judge. In refusing an examination or to take bail for the appearance of the defendant, I think

the county judge committed an error which was fatal to the validity of all the subsequent proceedings against the defendant. The examination of the defendant should have been taken by the county judge ; and if upon the examination of the whole matter, it appeared either that no offense had been committed, or that there was no probable cause for charging the defendant therewith, he should have been discharged. If there was probable cause to believe the defendant guilty, bail should have been taken, if offered by the defendant, for his appearance at the next court having cognizance of the offense. (2 *R. S.* 708, 709, 710.)

A court of special sessions is one of limited jurisdiction, deriving all its powers from the statute. The modes in which it can acquire jurisdiction to try a person charged with an offense triable before it, are pointed out by the statute.

In 2 *R. S.* 711, §§ 2 and 3, it is provided that a court of special sessions shall be organized to try such persons, 1st. When such person shall request to be so tried ; 2d. When he shall not make such request, and after being required by the magistrate before whom he is brought shall omit for twenty-four hours after being so required, to give bail for his appearance at the next criminal court having jurisdiction.

The court of special sessions held by the county judge, for the trial of the defendant, did not acquire jurisdiction over his person in either of these modes. It is true that the act for the prevention of intemperance, pauperism and crime, does not in terms provide that jurisdiction over the person can only be acquired by such courts of special sessions as it directs to be held in the modes pointed out by the revised statutes ; but the act, in section 5, provides that the several magistrates named in that section shall hold courts of special sessions, and shall *exercise the same authority* that may be exercised by justices of the peace in criminal cases, *and by courts of special sessions as the same are now constituted.*

I conclude, therefore, that the legislature did not intend to extend the jurisdiction of courts of special sessions so far as to compel persons accused of offenses against the act in question to submit to a trial before such tribunals, in cases where such

persons should offer bail for their appearance at the next court of sessions or oyer and terminer, at all events. There is no express provision in the act to that effect, and I think that the right of a person thus accused to put in bail, involving as it does the right to have the accusation against him submitted to and passed upon by a grand jury, and the right to have any indictment which may be found against him tried by a jury in the ordinary course of the common law, cannot be taken away by uncertain inference, or doubtful implication.

My opinion therefore is, that the court of special sessions had no jurisdiction of the person of the defendant, that his conviction was void, and that he ought to be discharged from custody.

BROWN, J., and S. B. STRONG, J., concurred in the judgment of reversal, but dissented from Judge ROCKWELL's conclusion that the act under which the proceedings were instituted was constitutional.

Judgment reversed.

[DUTCHESS GENERAL TERM, July 21, 1855. *Brown, S. B. Strong* and *Rockwell*, Justices.]