SUPREME COURT, Erie General Term.    September, 1855.
Green, Bowen and Mullett, Justices.

JAMES G. WYNEHAMER, Pl'ff in error vs. THE PEOPLE, &c.,
Def'ts in error.

Bills of exceptions in criminal cases were unknown to the common law.
They are given by statute, and their office is to bring up for review ques-
tions of law decided at the trial.   They are limited to exceptions taken on
the trial of the *main issue*, and are not available as to decisions made on
the trial of preliminary, or collateral questions.
Decisions made on a motion to quash an indictment on the grounds of irregu-
larity in organizing the grand jury, and on the trial of an issue joined on a
challenge to the array of jurors, are not reviewable on a bill of exceptions.
The last clause of the first section of the act, entitled " an act for the pre-
vention of intemperance, pauperism and crime," passed April 9, 1855, does
not exempt imported liquors from the operation of that act, after they have
passed from the ownership of the importer.
The provisions of the first section of the act prohibiting the sale of intoxicat-
ing liquors, are not in contravention of that clause of the constitution of
this state, which declares, that " no person shall be deprived of life, liberty
and property without due process of law."

This case was brought up on a writ of error to the Court of
Sessions of Erie county.   The indictment was as follows:

*State of New York, County of Erie, ss :*
The jurors of the people of the state of New York, in and
for the body of the county of Erie, upon their oaths present,
that James G. Wynehamer, on the fifth day of July, in the
year one thousand eight hundred and fifty-five, at the city of
Buffalo, in the county aforesaid, without having any lawful
authority, willfully and unlawfully *did sell* to some person unau-
thorized by law to sell intoxicating liquor, to the jurors afore-
said unknown, intoxicating liquor, to wit: one gill of rum,
one gill of brandy, one gill of whisky, one gill of gin, one
gill of wine, one gill of strong beer, one gill of cordial—the
said intoxicating liquor then and there not being alcohol

manufactured by the said James G. Wynehamer, or pure wine manufactured by the said James G. Wynehamer from grapes grown by him, without having filed in the office of the clerk of the county of Erie, any undertaking approved by the county judge of the county of Erie, according to the provision of the second section of an act of the legislature of the state of New York, entitled "An act for the prevention of intemperance, pauperism and crime," passed April 9th, 1855; and the sale of which said intoxicating liquor, in the manner aforesaid, then and there not being authorized by any law or treaty of the United States; and no right then and there to sell the aforesaid intoxicating liquor, then and there being given by any law or treaty of the United States; and contrary to the form of the statute in such case made and provided, and against the peace of the people of the state of New York, and their dignity.

And the jurors aforesaid, upon their oaths aforesaid, do further present, that the said James G. Wynehamer on the sixth day of July, in the year last aforesaid, at the city and in the county aforesaid, without any lawful authority willfully and unlawfully did sell to some person unauthorized by law to sell intoxicating liquor, to the jurors unknown, intoxicating liquor, to wit: one gill of rum, one gill of brandy, one gill of whisky, one gill of gin, one gill of wine, one gill of strong beer, one gill of cordial—the said intoxicating liquor then and there not being alcohol manufactured by the said James G. Wynehamer, or pure wine manufactured by the said James G. Wynehamer, from grapes grown by him; without having filed in the office of the clerk of the county of Erie, any under-taking, approved by the county judge of said county, according to the provisions of the second section of an act of the legis-lature of the state of New York, entitled "An act for the pre-vention of intemperance, pauperism and crime," passed April 9th, 1855; and the sale of which said intoxicating liquor, in the manner aforesaid, was not then and there authorized by any law or treaty of the United States, and no right then and there to sell the aforesaid intoxicating liquor, then and there

Wynehamer v. The People.

being given by any law or treaty of the United States, contrary to the form of the statute in such cases made and provided, and against the peace of the people of the state of New York, and their dignity.

And the jurors aforesaid, upon their oath aforesaid, do further present, that the said James G. Wynehamer on the seventh day of July, in the year one thousand eight hundred and fifty-five, at the city and in the county aforesaid, without any lawful authority, willfully and unlawfully did sell to some person unauthorized by law to sell intoxicating liquor, to the jurors aforesaid unknown, intoxicating liquor, to wit: one gill of rum, one gill of brandy, one gill of whiskey, one gill of gin, one gill of wine, one gill of strong beer, one gill of cordial—the said intoxicating liquor then and there not being alcohol manufactured by the said James G. Wynehamer, or pure wine manufactured by the said James G. Wynehamer, from grapes grown by him, without having filed in the office of the clerk of the county of Erie, any undertaking, approved by the county judge of said county, according to the provisions of the second section of an act of the legislature of the state of New York, entitled "An act for the prevention of intemperance, pauperism and crime," passed April 9th, 1855; and the sale of which said intoxicating liquor then and there not being authorized by any law or treaty of the United States, and no right then and there to sell the aforesaid intoxicating liquor, then and there being given by any law or treaty of the United States, contrary to the form of the statute in such case made and provided, and against the peace of the people of the state of New York and their dignity.

ALBERT SAWIN, *District Attorney.*

The defendant pleaded not guilty.

The cause came on for trial in the Court of Sessions, on the 20th July, 1856.

The counsel for the defendant moved to quash the indictment because, among other things, of irregularity in impanneling and organizing the grand jury who found the indictment.

After hearing the motion argued by counsel, the court denied the motion, to which decision the counsel for the defendant excepted.

A challenge to the array of jurors was then interposed as follows: " and hereupon the said James G. Wynehamer, challenges the array of the said panel because he saith six days notice of the drawing of said jury was not given in the manner required by law. That no sheriff or county judge was present at the drawing of said jury. That such jurors were not summoned by the sheriff six days before the first day of court. That no list of jurors drawn was made or certified by the clerk, or delivered to the sheriff as required by law. That the officers who summoned said jurors have not made any proper or legal return, nor is there any proper return of lists of jurors delivered to the sheriff to summon. That the return of the lists of jurors delivered to him to be summoned does not specify the jurors summoned, nor the manner in which each was notified. That some of said jurors were summoned by Alvah P. Hamilton, who was not duly authorized or empowered to summon jurors, and this he is ready to verify, wherefore he prayeth judgment that the panel may be quashed."

To which challenge the following plea was interposed.

" The said people, by Albert Sawin, district attorney, to the above challenge answers and says, that none of the matters therein set forth are true and therefore he prays said challenge go for naught."

The counsel for both parties agree that the issue of fact joined on said challenge should be tried by the court, and the counsel for the prosecution proceeded to examine witnesses in support of the challenge. After hearing the evidence, the court decided the challenge was not well taken, to which decision the defendant's counsel excepted.

A jury was then impanneled, and the counsel for the people introduced evidence tending to show, that on several times and occasions, between the fourth and fourteen days of July, 1855, the defendant sold and delivered to several persons, in quanti-

Wynehamer v. The People.

ties less than one pint, brandy, at his bar in Buffalo, which was drank on his premises.

After the prosecution had rested the case, the counsel for the defendant requested the court, either to discharge the defendant, or to direct the jury to find a verdict of not guilty, on the following grounds.

1st. That it does not appear that any offence has been committed by the defendant.

2nd. That the charge in the indictment was not proved.

3rd. That it does not appear but that the liquor alleged to have been sold, was liquor the right to sell which was given by laws or treaties of the United States.

4th. It does not appear but the liquor sold was imported into this country by defendant, from foreign countries in pursuance of the United States laws.

5th. That the first section of the act entitled " An act for the prevention of intemperance, pauperism and crime," is in violation of the constitution of this state and of the United States, and is void.

6th. That the fourth section of said act is likewise contrary to said constitution and is void.

7th. That the whole act is also unauthorized by and in conflict with the laws and treaties of the United States and the constitution of the state of New York, and is void.

8th. That it does not appear but that the liquor sold by the defendant, if any, was authorized to be sold by the statute above referred to.

The court overruled each of the objections, and the defendant's counsel excepted.

The defendant's counsel then offered to prove that the liquor sold by him was imported into this state from foreign countries, under and in pursuance of the revenue laws of the United States, and that the legal duties had been paid thereon, that the defendant purchased said liquor from the importers in the imported packages, and that the same was drawn from such packages and sold to the persons, and at the times proved by the witnesses for the people.

The counsel for the people objected to this evidence as immaterial. The court sustained the objection and excluded the evidence, and the defendant's counsel excepted.

The defendant's counsel then offered to prove that the liquor sold by him was owned by him on and before the third day of July, 1855.

The counsel for the people objected to this evidence as immaterial, the court sustained the objection and the defendant's counsel excepted.

The evidence being closed, the counsel for the defendant asked the court to direct the jury to acquit the defendant, on each and all the grounds before stated by him. The court refused so to charge, and the defendant's counsel excepted.

The jury found the defendant guilty, and judgment being rendered on such verdict by the court, the defendant sued out a writ of error to this court.

*F. J. Fithian,* for plaintiff in error.

*A. Sawin* (Dist. Attorney,) for the people.

*By the Court,* GREENE, J.—All of the exceptions taken by the defendant to the rulings of the court below on the motion to quash the indictment for irregularity, and on the trial of the issue joined on the challenge to the array are improperly incorporated in the bill of exceptions. Bills of exceptions in criminal cases were unknown to the common law. The right to a bill of exceptions in such a case is given by statute. Its office is to bring up for review questions of law made and decided on the trial. But the statutes which give the right, limit it to exceptions taken on the trial of the *main issue.* It is not extended to such as are taken on the trial of preliminary or collateral questions, (2 *R. S.* 736, *S.* 21; *The People* v. *Freeman,* 4 *Denio,* 21, *per Beardsley, J.*) It will therefore be unnecessary to examine the various questions raised by those exceptions, as our conclusion on them either way could not affect the result. The same answer must be given to many of the questions suggested

by the exceptions taken on the trial of the main issue and discussed on the argument. *The facts proved* on the trial do not raise the questions, and any opinion which we might express upon them would be the mere result of a gratuitous speculation upon questions in which the defendant has no legal interest.

The indictment was for selling brandy (not being liquor, the sale of which was authorized by the laws of the United States) to persons not authorized to sell liquor by the act under which the indictment was found. The prosecutor proved several sales by the defendant of brandy at his bar in quantities less than one pint, which liquor was drank on his premises. The defendant offered to prove that the brandy sold by him was imported from foreign countries under the revenue laws of the United States, that the duties had been paid thereon, that he purchased it from the importer in the packages in which it was imported, and that it was drawn from the packages and sold by him, as proved on the trial. The evidence was rejected as immaterial and the defendant excepted. He also offered to prove that the liquor in question was owned by him on and before the third day of July, 1855. This evidence was rejected on the same ground, and the defendant excepted.

Two questions of law arise on these facts and exceptions: 1st. What is the extent of the prohibition *upon the sale of liquor* contained in the first section of the act as it is qualified by the second and other sections, and 2d. Is *that prohibition* a valid legislative act.

That part of the first section that bears upon these questions is in these words: " Intoxicating liquor except as hereinafter provided shall not be sold * * * * by any person for himself or any other person in any place whatsoever." Then follows divers provisions prohibiting the giving away or keeping such liquor in certain specified places, which provisions, as they have no bearing upon the questions above stated, require no examination. The last clause of the section is in these words: " *This section shall not apply to liquor* the right to sell which is given by any law or treaty of the United States."

The second section provides that certain persons on com-
plying with its provisions " may keep for sale and may
sell intoxicating liquor and alcohol for mechanical, che-
mical or medicinal purposes, or wine for sacramental use."
The twenty-second section contains several provisions in rela-
tion to the construction of the act, and among others a provision
that nothing in the act shall be construed so as to prevent " the
importer of foreign liquors from keeping or selling the same in
the original packages to any person authorized by the act to
sell such liquors." These provisions embody all the prohibi-
tions and exceptions material to the questions under considera-
tion contained in this act.

It will be observed that this act contains no provisions
excepting any liquor *specifically* from the operation of the
prohibitory clause. The exception in the first section relates
to " liquor the right to sell which is given by any law or treaty
of the United States." No law or treaty of the United States
has been cited, and I am not aware that any exists, expressly
giving the right to sell any *specific* liquor. But there are
divers laws and treaties providing and stipulating for the
admission of foreign liquors into the United States upon cer-
tain terms prescribed by such laws and treaties. These laws
and treaties were created and entered into in pursuance of the
power conferred upon congress by the constitution of the Uni-
ted States " to regulate commerce with foreign nations and
among the several states and with the Indian tribes." (*Art.* 1,
§ 8.) In the case of *Brown* v. *The State of Maryland* (12
*Wheat.*) it was held by the Supreme Court of the United
States that an act of that state requiring importers to take
out a license to sell imported merchandise was repugnant to
the provisions of the constitution of the United States, prohi-
biting the states from laying duties upon imports. Chief Jus-
tice Marshall in the same case held that an importer of foreign
merchandise who had imported the same under the revenue
laws of the United States acquired a right under such laws to
sell the imported article in the *state* and *condition* in which it
was imported, that the law of Maryland was a regulation of

foreign commerce and as such was in conflict with the revenue laws of the United States. Justice Thompson dissented from the positions taken by the chief justice, and insisted upon the right of the state to levy the license tax as a legitimate exercise both of its power of taxation and its power to regulate its own internal trade, holding that the importer acquired no right under the laws of the United States to sell the imported article independent of state regulation. In the cases of *Pierce* v. *The State of New Hampshire*, *Thurlow* v. *The State of Massachusetts*, and *Fletcher* v. *The State of Rhode Island*, commonly known as the " license cases," (5 *How. S. C. R., p.* 1,) the question as to the right of the states to regulate and prohibit the sale of liquors, the importation of which was authorized by the laws of the United States, was brought before the same court. The statute of Massachusetts under which one of the cases originated made it unlawful for any person to sell intoxicating liquor without a license, in quantities less than twenty-eight gallons. The law also contained an express provision that the selectmen in whom the power to grant licenses was vested, should not be *compelled to grant any licenses*. The statute of New Hampshire prohibited the sale of liquor in that state in *any quantity* without a license. The law of Rhode Island contained provisions similar to those contained in the law of Massachusetts. The defendants were indicted and convicted in the state courts for violations of these laws, and the judgments being affirmed by the Supreme Courts of the states respectively, were carried by writs of error to the Supreme Court of the United States. In that court it was contended on the authority of *Brown* v. *Maryland*, that the laws of Massachusetts and Rhode Island were void on the ground that the laws of the United States authorized the importation of the liquor sold by the defendants in those cases (which liquor had been actually imported) and that the state laws were in conflict with those of the United States. The liquor sold by the defendant in the New Hampshire case was imported from Massachusetts and it was contended that the law of that state was repugnant.

to the provision of the constitution authorizing congress to regulate commerce among the states.

But the court held that the laws of the states must be construed as applying exclusively to the *domestic* trade in liquor, that they had no application to imported liquor in the hands of importers, that they did not interfere with his right to sell in the original packages as laid down in *Brown* v. *Maryland,* and were not for that reason in conflict with the laws of the United States under which the liquor was imported. In the New Hampshire case it was held that the state law was a regulation of commerce " among the states within the meaning of the constitution and so within the power of congress. But the law was sustained on the ground that the power of congress and the state legislature were concurrent and that as congress had passed no law regulating commerce among the states the state law was valid until congress passed some law conflicting with the provisions of the state law. Chief Justice Taney in these cases reiterated the doctrine laid down by Chief Justice Marshall in *Brown* v. *Maryland* and held that the right to sell imported liquor derived from the United States was confined to the importer and to liquor in the casks or packages in which it was imported and that when it passed from his hands it ceased to be *an import* and became subject to state regulation. It will be remembered that the law of Massachusetts prohibited sales in less quantities than twenty-eight gallons and that the law of congress authorized the importation of the *same liquor* in quantities of fifteen gallons and that the law could be sustained upon no other ground than that assumed by the chief justice consistently with the rule asserted by the majority of the court, in *Brown* v. *Maryland.* In the license cases, Justices Daniel, Woodbury, and Grier dissented from the doctrine laid down by the chief justice and by Chief Justice Marshall in *Brown* v. *Maryland* asserting the right of the importer under the laws of the United States to sell imported merchandize uncontrolled by state regulation. The soundness of this rule is questioned by those learned justices and *Brown* v. *Maryland* was not regarded as an *authority* for the rule.

Wynehamer *v.* The People.

The question was not directly involved in either case and it may be doubted whether it is not still open to discussion upon principle. But it will be perceived that the right to sell imported liquor given by the laws of the United States under the broadest rule laid down by a majority of the court in the cases cited is subject to two important qualifications. 1st. That it remains in the hands of the importer, and 2d. That it shall be sold in the condition in which its importation is authorized, that all sales by *other persons or in any other quantity or condition* than that in which it is imported are subject like the sales of all other property to such regulations as may b? prescribed in state laws.

The question then arises as to the true construction of the exception contained in the first section of the prohibitory act. The plaintiff in error contends that it extends to all *liquors in specie,* the right to sell which under *any circumstances* is given by the laws of the United States. The repugnancy of this construction to the entire policy of the act as manifested by its provisions, is too plain to escape observation and if the language of the exception will fairly admit of two constructions it should receive that which will best harmonize all the provisions of the act. The object of this clause, whatever the effect of its construction may be, is rendered plain by a reference to the subject matters to which it relates. It was assumed by the legislature that a right to sell certain liquor was given by the laws of the United States. We have seen that this right considered in its utmost extent as defined by the court whose province it is to give a construction to those laws is neither general as to persons nor in its application to the property to which the laws in question relate. The right on the contrary is limited to *certain persons* and qualified by the *status of the property.* While it is in the hands of the importer, and in the condition in which it was imported, the laws under which he has imported it, give him a right to sell it in that condition. This is the extent of the right. When he parts with the property, or changes its condition, his right and *all right* to sell it, derived from those laws, ceases. It is no

longer the right to sell *which* is given by the laws of the
United States. The object of this exception in the first section
clearly was by preserving the right secured by the laws of the
United States to avoid collision with those laws, and the general exception of *certain liquors in specie*, from the operation
of the first section which is claimed from a literal reading of
the clause in question should be controlled by the limitations
as to persons and the qualifications as to the status of the property which are annexed to the right of sale given by the laws
of the United States, so that the provisions of the first section
will not apply to imported liquor still in the hands of the importer and in the casks, bottles or packages in which it was imported. The propriety of this construction is rendered plain
by a reference to the language of the 22d section already
quoted. This clause whatever its purpose, or however unnecessarily inserted may be resorted to on this question of construction as evidence of the intention of the legislature. The
second section as we have seen, provided that certain persons,
on the conditions therein prescribed might sell liquor for certain purposes. Importers were not mentioned in this section,
nor was it necessary under any construction of section first
according to the rule laid down in the license cases that importers should be mentioned in that section, but the legislature
apparently as a matter of precaution inserted the clause last
cited in the twenty-second section. It refers to the same subject matters as the last clause of section first, and may be properly read in connection with it, and when these two clauses are
read together in the light of all the provisions of the act, I
think the true construction of the first section is reasonably
plain. It follows that the liquor sold by the defendant was not
exempted from the operation of that section. The evidence
offered by him to prove that it had been imported was therefore
immaterial and was properly rejected. The only remaining
question is as to the validity of the prohibition. It is claimed
by the defendant that the prohibition is repugnant to the provisions of the sixth section of the first article of the constitution and therefore void. That part of the section in question

Wynehamer *v.* The People.

to which the prohibition is supposed to be repugnant is in these words: " No person * * * * * shall be *deprivea* of life, liberty, or *property,* without due process of law; nor shall private property be taken for public use without just compensation."

I do not understand that it is claimed that this provision of the act violates the prohibition contained in the last clause of that part of the section above quoted. It certainly can not be maintained that this part of the act provides for the *taking* of property in any sense of the term. But it is claimed that this prohibition of the sale of liquor does in *effect deprive* the owner of his property in it. The argument is that the right to sell and traffic in property is incident to and inseparable from the title, that such right is one of the chief elements of its value and that a law prohibiting the exercise of this right virtually deprives the owner of his property. That liquor is property, that the right to sell property is one of its recognized legal incidents and that " due process of law " which the constitution prescribes as the only condition upon which the owner of property can be deprived of it, means a trial and judgment in a regular judicial proceeding are propositions too well established to admit of argument or require the support of authority. But that the right to sell and use property at the will of the owner is absolute and subject to no restraint can not be maintained and will hardly be asserted. The rights and interests of individuals are, to some extent at least, subordinate to those of the public and must yield to them in cases of conflict. It is the acknowledged province of legislation to prescribe by law such rules concerning the title to property and its sale and use as will, in the judgment of the legislature, most effectually secure to the owner the enjoyment of these rights on the one hand and on the other protect the public from injuries that may result from the exercise of them. This power however is subject to the restraints imposed by the constitution through which in this state the legislature derives its powers. We have then only to compare the provision heretofore cited of the first section of the prohibitory act with the above provi-

sion of the constitution, and from such comparison to determine whether there is any conflict between the law and the constitution. The provision of the first section as qualified by the second section so far as the sale of liquor is concerned is in substance that intoxicating liquor except for mechanical, chemical or medicinal purposes shall not be sold, &c. The provision of the constitution is that no man shall be deprived of his property without due process of law. The question is, does this prohibition *deprive* the owner of liquor of that property? It does not deprive him of the possession or use of it; but while it remains in the state, subject to the law, it undoubtedly diminishes its value; and hence it is agreed, that the owner is to that extent virtually deprived of it. Substantially the same prohibition as that contained in our present constitution, has existed in all our constitutions since the organization of the state government; and under each of these constitutions laws were passed imposing restraints, to a greater or less extent, upon the sale of liquor. The validity of those laws has never, to my knowledge, been questioned. But the difference, it is urged, between those laws and the present law is, that those laws merely *regulated,* while this *prohibits* such sale. It remains to be seen whether there is any difference in principle between the two cases when they are regarded with reference to the objection now under consideration. The only cases cited in which this question has been considered by this court, are those of *The People* v. *Berberrich,* and *The People* v. *Toynbee,* decided at a general term in the second district, by Justices Brown, Strong and Rockwell. A prosecution was commenced in each case before a magistrate, upon a charge of selling, and having with intent to sell, intoxicating liquor. Both defendants were convicted, and in *Toynbee's* case a fine was imposed pursuant to the statute, and a judgment of forfeiture, directing the destruction of the liquor, was rendered, from which judgment the defendant appealed to this court. *Berberrich's* case was removed by certiorari before sentence. An objection was taken before the magistrate in *Toynbee's* case, to the sufficiency of the complaint, and also to the jurisdiction

Wynehamer *v.* The People.

of the magistrate to proceed to try the case after the defendant had offered to give bail to answer to an indictment; and, as I understand the opinion of Justice Brown, the last objection was taken in *Berberrich's* case. Justice Strong held both objections good, and my recollection of Justice Rockwell's opinion (which I have not now before me) is, that he concurred with Justice Strong as to the validity of the above objections, and concurred in the judgment *on that ground alone.* Justice Brown held that the last objection was not well taken, but held that the first section of the law, so far as it prohibits the sale of liquor, the sections or provisions which provide for its seizure and destruction, and several other provisions under which (as I understand the facts from the several opinions) no ques tions were raised in the cases, were unconstitutional. Justice Strong concurred in this opinion as to the unconstitutionality of the prohibitory clause of the first section, and the judgments were reversed. Both of the learned justices placed their opinion upon the ground that the prohibition of the sale of liquor was *virtually* depriving the owner of his property in it. Justice Strong says: " The protection of any species of property must necessarily extend to its essential and definitive characteristics, *especially those which constitute its main value.* * * * One of the essential characteristics of property is its vendibleness, especially for the principal use to which it can be appropriated. * * That the manner of selling it may be *regulated,* so long as the *right is essentially preserved,* there can be no doubt. * * * Upon the whole, my conclusion is, that the right of property extends not only to its *corpus, but to ordinary and essential characteristics,* of which the right of sale is one, and that it can be controlled *only so far as to prevent abuse,* without destroying such characteristics." The learned justice, speaking of our former excise laws, thus states the difference between the present statute and those laws: " They were, however, by no means *prohibitory of the right;* every man was at liberty to sell in quantities exceeding five gallons, and a *selected class,* in any quantity." In conclusion, the learned justice says: " I consider the statute in question as

*mainly prohibiting* the sale of intoxicating liquor as a beverage, and destructive of its *principal value;* and with that impression, I must adjudge it to be null and void to that extent." Justice Brown, speaking of the character of the act, says: " If its office is one of mere regulation, to prescribe *by whom* and to whom and at what places liquors in certain quantities may be sold, then it does no more than the excise law which it is thought to supersede; and although *prejudicial to existing interests*, and may subject certain classes to *some privations and inconvenience*, it is nevertheless a law of binding obligation, which the people must obey and the tribunals of justice enforce." Speaking of the written limitations upon legislative power, contained in our state constitution," the learned justice adds: " They were intended to save absolute inherent rights from the power of legislative acts which *interrupt their enjoyment* or *impair* their value. \* \* \* There can be no property, in the legal and proper sense of the term, where neither the owner or the person who represents the owner has the power of the sale and disposition. That which can not be used, enjoyed or sold, is not property; and to take away all *or any* of these incidents, is in effect to deprive the owner of his property."

Both of the learned justices from whose opinions I have quoted, concede the power of the legislature to regulate the " manner of selling," and to prescribe " by *whom* liquors in certain quantities may be sold." Upon what principle, consistent with this constitutional provision, if it is applicable at all to this species of legislation, can the legislature, in the language of one of the learned justices, prescribe " *by whom*" liquors in certain quantities may be sold, or in the language of the other learned justice, designate a " *selected class*" to sell in such quantities, while it *prohibits* others from doing the same thing. Those who do not happen to be thus " *prescribed*" who do not belong to the " selected class," and who may happen to own liquor in quantities less than those in which all are authorized to sell, would be as effectually " *deprived of their property*" under such a law, as those who own larger

Wynehamer *v.* The People.

quantities are so deprived by this law. It is no answer to say that such a law would affect but few persons and a limited amount of property, nor that its object is to *regulate* " *only so far as to prevent abuse.*" The protection of this constitutional provision, in its letter and spirit, extends in equal measure to each individual, and the aggregate population of the state, and to *all property*, whether its value is measured by mills or millions. It matters not whether a few or many are deprived of their property, or whether the amount of which they are deprived be small or great, whether a person is deprived of an inconsiderable portion or all of his property. The constitutional prohibition is not fractional, but an unit, indivisible and absolute. It regards the *character of the act*, and not the *extent of its consequences*. If the act is prohibited, no consideration of consequences can change its character, nor can it be palliated by the purpose which prompted it, however laudable. If, therefore, a law, which in its operation diminishes the value of property, can be regarded as *depriving* the owner of it, no law that produces that effect can be sustained. The argument under consideration, when followed to its logical consequences, will not, and can not be satisfied with the overthrow of the law in question. Many of our police and sanitary, and all of our commercial regulations, our quarantine and usury laws, must share the same fate. Their effect upon property is the same, the difference is only in degree; and if this constitutional provision applies to any such laws, it necessarily prohibits all. For the attempted distinction between the " *essential characteristics*" of property and any of its incidents or qualities which are regarded as elements of its value, whether they " *constitute its main value,*" or only a small part of it; and between laws which " subject" " certain classes to *some privations*," and laws which affect all classes, and involve great privations, there is no foundation in the constitution, whose protection and prohibition are general, nor, I respectfully submit in reason, which rejects distinctions when it fails to perceive differences. The validity of such laws rests upon no restricted

construction of this constitutional provision, but upon a prin-
ciple of the common law, older than constitutions, coeval with
the earliest civilized ideas of property. That principle is, that
every man shall so use and enjoy his own, as not to injure
another, and especially that the use which he makes of his
property shall not work a public evil. This is another *incident*
to the right of property *as inseparable* from the title as the
right of sale, or any other right of enjoyment annexed to it.
The legislature which exercises the sovereign power of the
state is clothed with the power and charged with the duty of
promoting its prosperity, by regulating its internal commerce,
and holding out suitable encouragement to the industry of its
citizens, of preserving the public peace, by preventing and
punishing crime, and guarding the health and morals of the
people, by such laws and regulations as in its judgment may
seem likely to promote these objects. *Subject only to the
limitations prescribed by the constitution*, the powers of the
legislature for these purposes are unlimited. In the choice of
the means its discretion is plenary. If, in its judgment, the
trade in any article is incompatible with, or dangerous to any
of these objects of its protection, that trade may be regulated,
restricted or *prohibited in the discretion of the legislature*. It
is admitted that the sale may be *controlled,* but it is claimed
that it can be done *" only so far" " as to prevent abuse."*
According to this proposition, if abuse should be found in-
separable from, or so generally attendant upon the exercise of
the right, as to render the permission of the one, and the pre-
vention of the other impracticable, the right to prohibit would
necessarily follow. Whether this abuse is so intimately con-
nected with this traffic is a question of fact, proper for the
consideration of the legislature, in the exercise of its direction,
to ascertain the necessity and determine the extent of its
action; but this is an inquiry which the court can not entertain
in considering a question of power. The foregoing propositions
can not be more clearly illustrated or more powerfully enforced
than they are in the language of Chief Justice Marshall, in
*Brown* v. *Maryland.* In reply to the argument of the counsel

Wynehamer *v.* The People.

for the state, in favor of the power there claimed, to lay duties on imports, or to require importers to procure licenses from the state to sell their imports, in which it was urged that the states would not be likely to impose such terms as to discourage or diminish importation, the chief justice said—" It is obvious that the same power which imposes a light duty can impose a heavy one, one which *amounts to prohibition.* Questions of power do not depend on the degree to which it may be exercised. If it *may be exercised at all,* it must be exercised *at the will of those in whose hands it is placed.* * * * The question is, *where does the power reside, not how far will it be probably abused.* The power claimed by the state is, in its nature, in conflict with that given to congress, and the greater or less extent in which it may be exercised, does not enter into the inquiry concerning its existence."

The law of this state, which was superseded by the act in question, was probably as favorable an illustration of the exercise of the *regulating* power as could be instanced. I understand both of the learned justices, whose opinions are above quoted, to concede the validity of its provisions. And yet a slight consideration of its practical effect will show that the alleged " absolute and inherent rights" of the owners of this property did not escape the obnoxious effect attributed to the law in question, but that on the contrary it interrupted their enjoyment and impaired " their value." It prohibited all but a " selected class" from selling in less quantities than five gallons, and thus not only " interrupted," but *destroyed* the right to that extent. It circumscribed the market, and decreased the demand for the article to a certain extent, and thus " impaired its value " to the same extent. Similar illustrations might be drawn from our quarantine and health laws, and the police and other regulations of municipal corporations. But I propose to pursue the history of legislation on this subject, and to examine briefly some of the adjudications upon the laws of other states. By the law of Massachusetts, under which one of the license cases arose, all persons were prohibited from selling liquors in quantities less than twenty

eight gallons, without a license, and the act contained a pro-
vision that the commissioners of excise should in no case be
compelled to grant a license. This law it will be seen exer-
cised the power of *regulation* to an extent approaching very
nearly to *practical prohibition*. The law of Rhode Island,
under which another of those cases arose, contained a provision
similar to that of the Massachusetts law, fixing the minimum
quantity that might be sold without a license, at ten gallons.
The law of New Hampshire went still further, and prohibited
*all sales* without a license. There was no provision in the law
under which licenses to any extent could be procured as a
matter of right. The power of granting and refusing licenses
was to be exercised in the discretion of the officers, designated
for that purpose. It will be seen that *absolute prohibition*
might result from the operation of this law. That this was the
design of the law, and the effect of its operation in a great
majority of cases, no one can doubt. That all of these laws
contained unusually stringent restrictions upon the sale of
liquor; that they seriously interrupted the enjoyment and im-
paired the value of the right of sale, no one will deny; but
whether the right, in the language of Justice Strong, was even
" essentially preserved " by the New Hampshire law, might
well be doubted. As was natural, these laws encountered
sturdy opposition from the interests so seriously affected by
them. They were subjected to the most searching judicial
scrutiny, and their validity was affirmed by the Supreme Courts
of the respective states. The constitution of each of those
states contained the same prohibition against depriving citizens
of their property, " without due process of law," as is relied
on in this case; and yet it is a remarkable fact, that in all the
discussions which these cases underwent in the state courts,
this objection was not suggested. The question, as we have
seen, which was argued in the Supreme Court of the United
States was, whether those laws were in conflict with those of
congress, regulating commerce. The question now under con-
sideration could not arise in that court, and for that reason the
decided opinions of the chief justice and other members of the

court, in favor of the right of the states to prohibit entirely the domestic traffic in liquor, can not be regarded as authority in the strict sense of the term on this point. But the construction by that court of the state laws, which in their terms comprehended *all liquors,* limiting their application to the domestic trade for the purpose of maintaining the validity of those laws, shows the high sense entertained by that court of the importance of preserving in its utmost latitude the power of the states to control by restrictions or prohibitions its domestic trade. A legislative recognition of the same principle equally significant, is found in the excise laws passed by congress in 1794 and 1813, each of which contained a proviso that no license to sell liquor should be granted under the law to any person who was prohibited from selling by the laws of any state.

Another instance of the exercise of this power of regulation to the extent of *absolute prohibition* is furnished by the embargo law passed by congress in 1807, which prohibited all *importation* and *exportation* to or *from any foreign country.* The laws were by their terms unlimited as to the time of their duration and were maintained in full force for nearly two years. It was objected to them that the constitutional power to regulate commerce under which the law was passed did not authorize congress to *destroy* commerce as those acts confessedly did. The question was raised in the District Court of the United States, for the district of Massachusetts in the case of the *United States* v. *The Brigantine William,* (2 *Hall's Law Journal,* 253,) in which a libel was filed to enforce a forfeiture of the vessel for being engaged in the exportation of merchandise in violation of those laws. It was argued in behalf of the claimant that the acts of congress were utterly void; that there was not only an entire want of power in the constitution to prohibit commerce, but that the act was in direct violation of the grant of power to regulate, which necessarily implied the duty of preserving the thing to be regulated. The court held the law to be constitutional. Davis, district judge, in an elaborate opinion, examined the question in all its bearings.

In discussing the questions as to the nature and extent of legislative power, and the *restrictions upon it which could be enforced by the judiciary*, the learned judge said, "*affirmative provisions and express restrictions contained in the constitution* are sufficiently definite to render decisions, probably in all cases, satisfactory, and the interference of the judiciary with the legislature, to use the language of the constitution, would be reduced to '*cases*' easily to be understood, and in which the superior commanding will of the people, who established the instrument, would be clearly and peremptorily expressed. To extend the censorial power further, and especially to extend it to the degree contended for in the objections under consideration, would be found extremely difficult, if not impracticable in execution. To determine where the legitimate exercise of discretion ends, and usurpation begins, would be a task most delicate and arduous. Before a court can determine whether a given act of congress, *bearing relation to a power with which it is vested*, be a legitimate exercise of that power or transcend it, the degree of legislative discretion admissible in the case must first be determined. *Legal discretion is limited.* \* \* \* \* Political discretion has a far wider range. It embraces, combines, and considers all circumstances, events and projects, foreign or domestic, that can affect the national interests. *Legal discretion has not the means of ascertaining the grounds upon which political discretion may have proceeded.* It seems admitted that necessity might justify the acts in question. But how shall *legal discussion* determine that *political discretion*, surveying the vast concerns committed to its trust, and the movements of conflicting nations, *has not perceived such necessity.*" Speaking of the objects for which this power may be exercised, the learned judge said, "the mode of its management is a consideration of great delicacy and importance, but the national right or power, under the constitution, to adapt regulations of commerce to other purposes than the mere advancement of commerce, appears to me unquestionable." The late Justice Story, in commenting upon this provision of the constitution, and in the same connection on the embargo laws,

Wynehamer. *v.* The People.

and the question involved in the case just cited, says: " No one can reasonably doubt that the laying of an embargo, suspending commerce for a limited period, is within the scope of the constitution. But the question of difficulty was, whether congress, under the power to regulate commerce with foreign nations, could constitutionally suspend and interdict it, wholly, for an unlimited period, that is by a permanent act, having no limitation as to duration, either of the act or of the embargo. * * * An appeal was made to the judiciary upon the question, and it having been settled to be constitutional the decision was acquiesced in, though the measure bore with almost unexampled severity upon the eastern states, and its *ruinous effects* can still be traced along their extensive sea-board. * * * * Non-intercourse and embargo laws are within the range of legislative discretion; and if congress have the power for purposes of safety of preparation or counteraction, to *suspend* commercial intercourse with foreign nations, they are not limited as to *duration*, any more than as to the manner and extent of the measure."

The effect of these laws upon private property was far more extensive and destructive than any that can possibly result from the law in question. The right to export property, designed and valuable only for that purpose, was one of those " essential and definitive characteristics which constituted its main value." The prohibition was " *destructive of its principal value*," and property of the value of many millions was rendered worthless by their operation. The constitution of the United States contains the same restrictions upon the legislative power of congress that is imposed by the constitution of our state upon its legislature, that no man shall be deprived of his property without due process of law. But in all the opposition which the embargo laws encountered, the objection that they violated this provision of the constitution occurred to none of its astute and able opponents.

The case of *The William* is a direct *authority* for the proposition that the national government, under the constitutional grant of power to regulate commerce, may restrict it *in its*

*discretion*, that such restriction may be carried to the extent of absolute prohibition, and that this power is not restricted to measures exclusively beneficial to commerce, but that it may be exercised as an instrument for other purposes of general policy and interest. These propositions may, in my opinion, be rested with equal safety upon the *authority* of this case, and the conclusive *reasoning* by which it is sustained. The powers of congress are enumerated in the constitution, and are expressly restricted to those so enumerated. The power in question is limited to commerce with foreign nations, and among the states. That the same power over internal commerce is reserved in all its amplitude by the several states, is not questioned, and that a state, by virtue of its powers of original sovereignty, which are merely limited by *specific restrictions* and not *enumerated* in its constitution, may, in the absence of such restrictions, exercise the same control over its domestic commerce, as that exercised by congress over foreign commerce, and for the same purposes, can not be doubted.

In view of this long-continued and uniform course of legislation, based upon the concurring authority of the general government and the several states, sanctioned by general acquiescence, and vindicated by judicial authority, whenever questioned, accompanied as such legislation has uniformly been, by cotemporaneous constitutional restrictions, identical with the restriction now invoked against this law, the question as to a conflict between the law, in the respect now under consideration, and the constitution, must be regarded as settled.

The prohibition in this act, as I have remarked, does not affect the possession of the property. It does not interfere with the right of sale, except within the state, and notwithstanding this prohibition, those interested in this property may manufacture and export it for sale elsewhere. I say notwithstanding this prohibition, I am aware that there are provisions in this act which were perhaps designed, and which may possibly be construed to prevent this. The provision that it shall not be *kept* in any place, except a dwelling house or church, has been

Wynehamer v. The People.

cited with others, supposed to evince a destructive purpose towards this property, which are alleged to be plainly repugnant to the constitutional rights of the citizen. But the defendant has not been prosecuted, nor has his property been proceeded against under these provisions. When he is indicted for *keeping* liquor, in violation of this act, or proceedings are instituted to enforce a forfeiture of his liquor, for any such cause different questions will be presented. With those questions we have nothing to do in this case. When they are legally presented for our consideration, the parties interested in them will be entitled to the deliberate and unbiased judgment of the court upon them. But to secure this, it is not only proper, but indispensable, that the parties interested, instead of the court, should be first heard. The legislature have said that the defendant shall not sell intoxicating liquor in this state. He has chosen to disregard that injunction, and has been convicted of an offence against the law. He disputes the right of the legislature to pass the law, and this question we are called upon to decide, nothing more. With the questions as to the wisdom, policy and propriety of the law which were discussed with so much zeal by the defendant's counsel at the bar, we have nothing to do. Those are questions addressed exclusively to the discretion of the legislature. This is a mere question of power. If the power which the legislature has assumed to exercise exists, and the law is plain, the duty of the judge and the citizen is the same, that of simple obedience. To both alike it speaks the language of command, and not of persuasion. I know of no principle recognized by the constitution, or resulting from any sound theory of government, which requires or authorizes the judiciary to interfere between the legislature and the people to shield the latter from the consequences of an improvident or capricious use, or even a positive abuse of legislative power. The remedy for such abuses, if they exist, is in other hands. It rests with the people, who in their constitution, have established the only restrictions upon legislative power that can be judicially recognized or practi-

cally enforced, except by those in whom the ultimate powers of sovereignty reside.

The judgment of the Court of Sessions should be affirmed.

---

SUPREME COURT. Monroe General Term, December, 1855.
*Selden, Johnson* and *Welles,* Justices.