---

## DORMAN *vs*. THE STATE.

[INDICTMENT UNDER SPECIAL STATUTE FOR SELLING SPIRITUOUS LIQUORS.]

1. *Constitutionality of prohibitory liquor law.*—The fourth section of the act "to incorporate the Southern University of Greensboro," (Session Acts of 1855-6, p. 221,) which prohibits the sale of any kind of spirituous or intoxicating liquors within five miles of Greensboro, is not violative of any constitutional provision, State or Federal.

2. *Form and sufficiency of indictment.*—In an indictment under this statute, the name of the person to whom the liquor was sold must be specified, or the person be otherwise described: section 1059 of the Code does not apply to such a case.

FROM the Circuit Court of Greene.

Tried before the Hon. WM. M. BROOKS.

THE indictment in this case was found at the fall term of said circuit court, 1857, and was in these words:

"The grand jury of said county charge, that before the finding of this indictment, Amasa M. Dorman, not a druggist keeping a regular drug-store, or practicing physician, sold, exchanged, or bartered away for money, or other consideration of value, or for the promise or expectation thereof, within the corporate limits of the town of Greensboro, or within five miles of said corporate limits, brandy, gin, wine, beer, ale, porter, or other intoxicating

Dorman v. The State.

drinks, against the peace and dignity of the State of Alabama."

The defendant demurred to the indictment, on the following specified grounds : " 1st, because it does not state that the alleged offense was committed after the first day of March, 1857 ; 2d, because it does not charge any offense punishable by the laws of this State; 3d, because it does not state to whom the alleged selling was made, or whether it was made to any legal person, or to any person at all ; 4th, because it is uncertain and insufficient; 5th, because the act of the legislature under which said indictment is framed—that is, the fourth section of said act— is unconstitutional and void; and, 6th, because said section of said act is in conflict with the constitution and laws of the United States."

The overruling of the demurrer to the indictment, with other matters which require no special notice, is now assigned as error.

E. W. PECK, for the defendant.—1. The indictment is insufficient in several particulars. The offense charged being purely statutory, the indictment must be framed in reference to the statute, and must conform to either its letters or its substance.—Skains and Lewis v. The State, 21 Ala. 223, and authorities there cited. The statute prohibits the sale, within certain specified limits, of " any brandy, gin, or other spirituous liquors, any wine, beer, ale, porter, or intoxicating beverages, simple or compound, in any quantities, large or small, to any person or persons whatever;" while the charge in the indictment is, that the defendant sold " brandy, gin, wine, beer, ale, porter, or other intoxicating drinks,"—which is not according to the letter or substance of the act. The indictment also fails to specify the name of the person to whom the alleged sale was made, or to allege that it was made to any person whatever; and in this particular it is fatally defective.—Francois v. The State, 20 Ala. 84; Brown v. Mayor of Mobile, 23 Ala. 722. The form of indictment prescribed by the Code is not applicable to such cases as this.—Camp v. The State, 27 Ala. 53.

2. The act under which the indictment was found, is void, because it is in violation of the State constitution. Written constitutions, and solemn declarations of rights, are not necessary, nor are they intended, to protect majorities, but to control and restrain them—to declare and defend the rights of minorities and individuals, and to protect them against the powers and encroachments of majorities. These purposes can only be accomplished by a firm, vigorous and fearless administration on the part of courts of justice, based upon a large and liberal construction of the language used, especially when employed, as in our bill of rights, with reference to the protection of the life, liberty and property of the people; and, for that purpose, to limit and restrain the legislative powers of the government.—3 Kernan, 398; 5 Paige, 145. In the preamble to our constitution the people say, that it was ordained in order to establish justice, insure tranquillity, provide for the common defense, promote the general welfare, and insure to themselves and their posterity the rights of life, liberty and property. In order to protect themselves the more surely against the powers and encroachment of the government which they were about to establish, and to secure, so far as human prudence and foresight could, a recognition of the great and essential principles of liberty and free government, it was declared by the first article of the constitution, commonly called "the bill of rights," that all freemen, when they form a social compact, are equal in rights; that no men, or set of men, are entitled to exclusive, separate public emoluments or privileges, but in consideration of public services; that no one shall be deprived of life, liberty or property, "but by due course of law;" and, as if to exclude any inference which might be drawn from the enumeration of certain rights, that such rights were the only ones intended to be thereby secured, the 30th section of that article declares, that such enumeration shall not be construed to disparage other rights retained by the people; and further, to guard against any encroachments of any of the high powers therein delegated, that everything in that article is excepted out of the general powers of the

government, and should forever remain inviolate, and that all laws contrary thereto should be void.

It thus appears, that the legislative power of the State is a limited power; that there are certain things which it cannot do. It cannot deprive a citizen of life, liberty or property: that can only be done "by due course of law." Nor can it destroy that general equality of rights, which, it is declared, all freemen possess when they form a social compact, unless the power to do so be expressly given, or arise by clear implication. Every citizen has the right to pursue any lawful vocation or business which may be pursued by any other citizen of the State. The legislature may prescribe qualifications, to be possessed before any business can be pursued; but such qualification must be attainable by all. In other words, the legislature may regulate any lawful business or pursuit, but cannot prohibit the same.—*In re* Dorsey, 7 Porter, 293, 360–62; 20 Barbour, 216–17.

If, then, a citizen cannot be deprived of life, liberty or property, but by due course of law; and if brandy, gin, and other spirituous liquors, wine, beer, ale and porter, be property, it follows that they are under the protection of the constitution, and that a citizen cannot be deprived of them but by due course of law. Are they property? The act itself recognizes them as property, in authorizing certain privileged persons to sell them for certain specified purposes. The laws of the State recognize them as property, in providing for the granting of licenses to sell them. The constitution of the United States recognizes them as property, in the power given to congress to regulate commerce with foreign nations and among the several States; and the several acts of congress made under that power, levying a duty upon the importation, and thereby authorizing them to be sold, recognize them as property. In Pierce v. New Hampshire, known as one of the "license cases," (5 Howard's U. S. R. 577,) Taney, C. J., says: "Spirits and distilled liquors are universally admitted to be subjects of ownership and property, and are, therefore, subjects of exchange, barter and transfer, like any other commodity in which a right of property exists." There

is no definition of property which does not apply to these articles. They have been separated from the common stock of nature, for private use. They are things over which a man may exercise absolute dominion, to the exclusion of every other person. Some of them are regarded as articles of diet, all as articles of trade and commerce : they are bought and sold, acquired and lost, like other property. In every sense of the term, therefore, they are property, endowed with the same rights, and subject to the same measure of control as other property, and no more.—People v. Toynbeck, 20 Barbour, 192. The right of property, which right consists in the free use, enjoyment, and *disposal of it,* without any control or diminution, save only by the laws of the land, is one of the absolute rights inherent in every freeman.—1 Bla. Com. 138. The absolute rights of individuals are, the rights of personal security, the right of personal liberty, and the right to acquire and enjoy property.—2 Kent's Com. 1. There can be no property, in the legal or popular sense of the term, where neither the owner nor the person representing him has the power of sale and disposition. That which cannot be used, enjoyed and sold, is not property.

These articles, then, being property, the owner cannot be deprived of them, "but by due course of law." What is the meaning of these words, as used in the constitution? The terms, "the law of the land," "due process of law," and "due course of law," whether found in the English charters and statutes, or in our American constitutions, have the same meaning. Lord Coke says, that "by the law of the land" means, "by due course and process of law, by indictment, or presentment of good and lawful men, where such deeds be done in due manner, or by writ original of the common law."—In Hoke v. Henderson, 4 Dev. Rep. 1, it is said, that the words "due process of law" cannot mean less than a prosecution or suit instituted and conducted according to the forms and solemnities for ascertaining guilt, or determining the right to property. In Westervelt v. Gregg, 2 Kernan, 209, it is said : "Due process of law undoubtedly means, in the due

course of legal proceedings, according to those rules and forms which have been established for the protection of private rights: such an act as the legislature, in the uncontrolled exercise of its power, may think fit to pass, is, in no sense, the process of law designated in the constitution." In People v. Toynbeck, 20 Barbour, 198, quoting from Hoke v. Henderson, *supra*, it is said, that the law of the land, as the term is used in the bill of rights, "does not mean merely an act of the legislature, for that would abrogate all restraints upon legislative authority." These authorities, with many others which might be referred to, conclusively show that "due process of law," as used in the bill of rights, does not mean merely an act of the legislature.

What, in legal contemplation, amounts to the depriving of a person of his property? It is not necessary for that purpose that his property should be forcibly taken from him, nor that the *corpus* of the property should be destroyed. The right of property, as above shown, consists in the free use, enjoyment, and disposal of it. These are the incidents and attributes of property. There can be no property, in the legal sense of the term, where the owner has not the power of sale and disposition. That which cannot be used, enjoyed and sold, is not property; and to take away any of these incidents or attributes, is, in legal contemplation and effect, to deprive the owner of his right of property.—20 Barbour, 195. The exclusive right of using and transferring property follows, as a natural consequence, from the perception and admission of the right itself.—2 Kent, 320. There is nothing which so generally strikes the imagination, and engages the affection of mankind, as the rights of property; that safe and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe. 2 Bla. Com. 2. The right of property extends not only to its *corpus*, but to all of its essential characteristics; one of which characteristics is the free right to sell and dispose of it, not for some special and limited purpose or use only, but for all the ordinary uses and purposes for which

it was designed, and without which it would be of little or no use. What is the especial purpose for which wine, beer, ale and porter are chiefly made? Is it not that they may be used as a beverage or diet by all who desire so to use them, and who are able to procure them? and are they not so used, in fact, by a large portion of the people in all the world? And for this purpose they must necessarily be bought and sold, as well as made. What would become of the Frenchman or Italian without his wine? the German without his beer? the Englishman without his ale or porter? Who would be the greatest sufferers by their destruction? not the rich and noble only, but the common people, the laboring classes.

That the act under consideration takes away some of the incidents of property from the articles enumerated in it, within the limits of the territory named, and therefore deprives the owner of his rights of property in them, is too plain for argument. Its manifest object and intent is to do that very thing, and its enforcement, if it be held valid, will accomplish that object and intent. It declares, that the specified articles shall not be sold, exchanged, or bartered away, for money or other consideration of value, or for the promise or expectation thereof, in any quantities whatever, to any person or persons whatever, unless the persons selling be druggists, keeping a regular drug-store, or practicing physicians; and by them the sale must be made in good faith, for medicinal purposes only. The fact that the operation of the act is limited to the corporate limits of the town of Greensboro, and the circumjacent territory within five miles thereof in every direction, does not relieve the act of this objection. Conceding that the legislature may prohibit the sale of these, or of any or all other articles, within the *immediate precincts* of court-houses, churches, colleges, or schools, no legitimate argument can be drawn from the concession in favor of the validity of this act, which covers a territory of more than one hundred square miles, including an entire town of no inconsiderable importance. If such a prohibition can be sustained, every city and town in the State may be environed by like prohibi-

tions; and thus, to every practical effect, the sale of these articles, and of any other articles which may happen at any time to become obnoxious to the legislature, may be prohibited over the whole State; for the cities and towns are, substantially, the only markets, not only for these, but for all other articles of trade and commerce. To exclude them from the towns and cities, is to drive them out of the State—to take from them the incidents of property, and thus effectually deprive the owner of his right of property in them.

The act also violates the first section of the bill of rights. It destroys that general equality of rights, which, it is declared, all freemen possess when they form a social compact. This section was intended to guaranty to every citizen, not only the same right to aspire to every office, but the same right to pursue any vocation or business which might be pursued by any other citizen.— 7 Porter, 360. This act takes away from every citizen, residing within the territory embraced by its provisions, the right to pursue a business which, independent of the act, is perfectly lawful. To declare a certain employment or business unlawful within a certain portion of the State, is to prohibit the people who live within the proscribed part of it from engaging in the business; and to say that they may engage in the business if they will abandon their homes, instead of answering or removing the objection, makes the act more odious.

3. The act is void, also, because it conflicts with the constitution of the United States, which gives congress the exclusive power to regulate commerce with foreign nations, and among the several States; and with the several laws of congress, passed in pursuance of that power, which levy duties on the importation of the articles specified in the act, and thereby authorize them to be sold. The object of importation is to sell the articles imported; the right to sell them constitutes the consideration for the payment of the duties; and the importer, by the payment of the duties, purchases this right.—Brown v. Maryland, 12 Wheaton, 442–47. This right in the importer, it is true, is limited to a right to sell the merchandise

in the form in which it is imported; that is, by the cask or package, and not by retail or otherwise. Does not this right of the importer to sell imply a corresponding right in the merchant thus to buy? and does not this right of the merchant necessarily carry with it the right to sell to the consumer? Commerce could not be carried on without the existence of these corresponding rights in the importer, the merchant, and the consumer. After merchandise has passed by sale out of the hands of the importer, or has been by him otherwise mixed with the general property of the country, then, and not till then, does the jurisdiction of the State over it attach, and its sale may afterwards be regulated by State laws; but the power of the State ends with regulation, and does not extend to prohibition.—12 Wheaton, 442–47; 20 Barbour, 216–17. "If the reasoning the chief-justice" (in Brown v. Maryland, *supra*,) "is entitled to any weight as authority, it is decisive of the question, so far as sales of foreign liquors by importers is concerned. The right of importation, we see, means the right to introduce foreign goods into the country, and to sell them to those who may choose to become purchasers. If State legislation can substantially take away from the mass of its citizens the power to become purchasers, a State can, in effect, impede foreign trade, and put an end to foreign importations."—20 Barbour, 203. If the reasoning of these decisions be correct, the act under consideration cannot stand. It is absolutely prohibitory within the territory covered by it, and its limitation within specified boundaries does not remove the objection. The constitution and laws of the United States embrace the entire territory of every State, and are not confined to the ports of entry, or the borders of the States. The power of congress to regulate commerce, says Marshall, C. J., "is coextensive with the subject on which it acts, and cannot be stopped at the external boundary of a State, but must. enter its interior."—12 Wheaton, 446.

S. F. HALE, with whom were M. A. BALDWIN, Attorney-General, and JAS. D. WEBB, *contra:*—The argument

against the constitutionality of the act under which the indictment in this case was found, renders it necessary to inquire into the powers of the government. The preamble to the constitution informs us, that the objects for which the government was formed, were "to establish justice, insure tranquillity, provide for the common. defense, promote the general welfare, and secure the rights of life, liberty and property" to its founders and their posterity. All these objects, then, are within the scope of governmental care and protection. In order to effectuate these purposes, the people, in convention assembled, divided all the powers of the government, by the 1st section of the 2d article of the constitution, into three departments—the legislative, the executive, and the judicial ; by the 1st section of the 3d article, vested the whole legislative power of the government in the senate and house of representatives; and specially enjoined it upon the government, by one of the general provisions of the constitution, that "schools and the means of education shall be forever encouraged in this State." Here, then, is a government created with sovereign and plenary powers, with a special injunction to encourage the means of education ; and the only limitations on its powers, supposed to be pertinent to this case, are the last clause of the first section of the bill of rights, the 10th section, the last clause of the 13th section, and the third clause of the 8th section of the first article of the constitution of the United States. On behalf of the State, the following propositions are submitted, which, it is insisted, are true in principle, are sustained by authority, and conclusively establish the validity of the act under consideration.

1. All the legislative power of the State is vested in the senate and house of representatives. The general assembly may exercise all such legislative powers as are not incompatible with the social compact, or prohibited by express constitutional provision. Education and morals are proper subjects of legislative protection, as well as life, liberty, or property. The legislative department of the government is the exclusive judge of all questions involving the policy, expediency, or necessity of legislation;

and no court can or ought to declare a law unconstitutional in cases of doubt, but only in cases where the law is clearly in violation of the provisions of that instrument. On these points see 24 Ala. 614; 1 Ala. 620; 12 Ala. 418; 3 Ala. 143; 21 Ala. 614; 17 Penn. 128; 16 Geo. 102; 3 Gibbs, 348, 403; 3 Kernan, 476–85.

2. The legislature has the power to prescribe the terms on which her citizens may engage in a given employment; and so long as the terms are uniform in reference to all her citizens, no exclusive emoluments or privileges, within the meaning of the constitution, are granted. 7 Porter, 361; 3 Ala. 137. It is conceded, that spirituous liquors are property; and that the free use, enjoyment, and right of sale, are among the ordinary incidents of property; but it is denied that the regulation, restraint, or even destruction of one of these incidents, is depriving a man of his property, within the meaning of the constitutional prohibition. It is insisted, on the contrary, that every government, claiming the attributes of sovereignty, has the power to regulate and restrain its citizens in the use and disposition of their property. The right of the owner to use or sell property, independent of the control of the government, has never existed since the institution of society, but is a right which was necessarily surrendered by him when he entered into the social compact. The act under consideration claims nothing more than to regulate and restrain the citizen in the use of his property. Shelton v. Mayor of Mobile, 30 Ala. 540; Chandler v. Intendant of Marion, 6 Ala. 899; Mayor of Mobile v. Yuille, 3 Ala. 137; 3 Gibbs, 330–42; 1 Gray, 27, and other cases in the same volume, where convictions were had under the same statute; 37 Maine, 161; 33 Maine, 559; 10 Foster, N. H. 229; 14 Ill. 196; 7 Cow. 605; 11 Met. 57; 7 Cushing, 85; 3 Rhode Island R. 68, 293; 3 Kernan, 378, *et seq.*, opinions of A. S. Johnson, L. A. Johnson, Selden, Mitchell, and Wright, JJ.; 5 English, 259; 8 Barr, 321; 12 Maine, 403; 15 Illinois, 588; 25 Conn. 290; 27 Vermont, 328.

3. The protection of property is not the only object of government. It has like power, and it is made its duty,

to protect the lives, liberty, health, and morals of its citizens, and to provide for their education. All these are proper subjects of legislation; and it is one of the highest duties of the legislative power to determine how far one of these interests must be restrained, in order to advance another, and for the general welfare of society.—See authorities above cited. . It has always been the policy of this State, as shown by successive enactments at nearly every session of the legislature, to regulate, restrain and control the traffic in spirituous liquors, and to permit them to be sold only in certain quantities, and under certain circumstances; and it involves the exercise of no more power to prohibit their sale at certain places, than to say they shall not be sold in certain quantities.—6 Ala. 899, *supra*.

4. The argument, that if this act be declared constitutional, the legislature may pass similar acts, until the area of the whole State is covered by them, though plausible, is not sound. If such legislation would be unconstitutional, the court is bound to presume that the legislature will never attempt it; for one department of the government can never indulge the presumption that another will transcend its legitimate powers. As well might the court hold the law forbidding the transaction of worldly business on Sunday to be unconstitutional, on the ground that the legislature might, in like manner, declare it unlawful to engage in worldly business on each of the other days of the week. The same argument was made against the constitutionality of the statute prohibiting the carrying of concealed weapons, and was overruled.—The State v. Reid, 1 Ala. 612.

5. The act under consideration shows, on its face, that the legislature did not intend to pass a general prohibitory law. It is equally clear that they did not in fact do so. It is equally clear that they have deprived no man of his property, and never intended to deprive any man of his property; and that all they have done, or intended to do, is to prohibit the citizens of the State from carrying on a certain trade at a certain place, except under certain conditions and restrictions. This is done by

every well-organized government in all countries, as is shown by the authorities above cited.

6. The power to take private property for public uses, is one asserted by every government, by virtue of its right of eminent domain. But that is a totally different power, and depends upon different principles from the right to regulate the use of property, which right is asserted by every government by virtue of its inherent power to adopt its own internal police regulations. The act under consideration does not take private property for public uses, nor for any other uses, but only regulates the use of private property. Consequently, the last clause of the 13th section of the bill of rights has no application to the case. Authorities *supra*.

7. Nor does this act regulate commerce with foreign nations, among the several States, or with the Indian tribes. It only proposes to regulate the internal traffic of the State, and that is all it does regulate. Every State has the power to prohibit the sale of any article within its limits, either by the importer or any other person, when, in the exercise of its conservative police powers, it becomes necessary to protect the health or morals, or to secure the general welfare of its citizens; and of this necessity each State is the exclusive judge for itself. This power is inherent in every sovereignty, and cannot be contracted by congressional legislation.—License cases, 5 Howard, pp. 586–632.

8. If, however, the court should not assent to the proposition last above stated, then it is insisted, that this power to regulate commerce is admitted by all the authorities not to be exclusive in congress, but to be possessed concurrently by the several States; and that, consequently, an act of the State legislature, imposing regulations on this subject, is not void, but only inoperative when it conflicts with the legislation of congress on the same subject. Therefore, before a citizen can claim immunity from the operation of the law, he must show that, in the particular matter wherein he is sought to be charged by the State law, he has the license of the law of congress to protect him. *Prima facie*, the citizen is amenable to the

Dorman v. The State.

State law; consequently, it cannot avail the defendant in this case to show that, notwithstanding the State law, the importer has a right to sell his imported liquors, unless he goes a step further, and shows that he is an importer, and that the liquor sold was imported by him, and was sold in the original casks. In other words, it is no defense to the defendant in this case, that another man, under other circumstances, is authorized by the laws of congress to sell liquor under a different state of facts. 5 Howard, 578–620; 2 Peters, 251; 37 Maine, 161; 14 Illinois, 196; 28 Ala. 185; 3 Rhode Island, 293.

As to the sufficiency of the indictment, see Code of Alabama, §§ 3518, 3519, 3523, 3502–3.

R. W. WALKER, J.—The principal question in this case is, whether the act, under which the defendant was indicted, can be sustained as an exercise of power belonging to the legislature. The solution of this question demands some inquiry into the nature and limits of the legislative power vested by our constitution in the general assembly.

Antecedent to the formation of the Federal constitution, the people of the several States constituted separate, independent, and sovereign communities, with all the rights and powers inherent in sovereignty. Some of these powers they delegated to the government formed by that constitution; but their essential sovereignty—the supreme ultimate power, which with us resides in the people alone, and cannot attach to government, and which is, in its very nature, incapable of mutilation or division—this they retained. Alabama became a member of the Union upon a footing of equality with the States which originally formed the Federal constitution. Consequently, although she has delegated to the general government the exercise of certain enumerated sovereign powers, she, like her sisters of the confederacy, the original parties to the compact of union, retains in its plenitude, unexhausted and unimpaired, her sovereignty as a State. The very existence of a State implies that it has appropriate organs to will and to act as such; and the necessity for these gives rise to government, which is, in fact, only the representative

of a State in its sovereign character, and the medium through which, as a sovereign, it speaks and acts. Each State of the Union has, therefore, a separate government of its own, which, being designed to extend to all the multiform and ever changing objects which, in the ordinary course of affairs, concern the lives, liberties, and property of the people, and the internal order and prosperity of the State, is the representative and organ of the entire mass of powers properly appertaining to government, except only those which have been delegated to the Federal government, or withheld by the people themselves in organizing the State government.

In the ascertainment of the respective powers of the Federal and State governments, this fundamental distinction is to be observed—that whereas, by the Federal constitution, the States have delegated to the government thereby organized only specifically enumerated powers, withholding all not named, the State constitution, on the contrary, contains a grant from the people of all powers not expressly withheld. In the Federal constitution, the enumeration of powers is of those delegated; in the State constitution, it is of those reserved. But for the enumeration, the Federal government would have no powers; but for the reservations, the State government would possess all the powers inherent in the people. Hence it has grown into a maxim of universal acceptance, among both jurists and statesmen, that "the Federal government can do nothing but what is authorised expressly or by clear implication, while that of the State can do whatever is not prohibited."—Sharpless v. Mayor, 21 Penn. 147–160; People v. Draper, 25 Barb. 359–60; Norris v. Clymer, 2 Barr, 285; Calhoun's Works, vol. 6, p. 224.

By the constitution of this State, the powers of government are divided, and distributed to three departments, the legislative, the executive, and the judicial. Section 1, article 3, declares, that "the legislative power of this State shall be vested in two distinct branches: the one to be style 'the senate,' the other 'the house of representatives,' and both together 'the general assembly of the State of Alabama.'" These words, standing by them-

selves, import a general grant of all that legislative power which resides in the people as a sovereign community. But a part of the powers inherent in the people they had already delegated to the general government; and these, of course, are excepted out of the grant here made to the State legislature. The force of these terms is further weakened by qualifications and limitations carefully expressed in the constitution itself. In the first place, the power here conferred is *legislative* power—the power to make *laws*. The executive and judicial powers are expressly confided to other departments, and each of these three departments is emphatically forbidden 'to exercise any of the powers belonging to either of the others.' (Article 2, sect. 2.) Here, then, is one restriction upon the legislative department of the State government. It can do no act not of the nature of legislative power. Any attempt on its part to exercise executive or judicial authority would be a naked usurpation. But there are still other restrictions, plainly declared in the constitution. The 1st article sets forth certain rights of the citizen, which are declared to constitute 'general, great, and essential principles of liberty and free government,' and which are expressly excepted out of 'the general powers of government.' Subject to the restrictions and limitations here indicated, the people of the State have conferred on the general assembly the authority to exercise every power, legislative in its nature, which they themselves, as a sovereign community, possessed. When, therefore, an act of the legislature is assailed as unconstitutional, the objector assumes the burthen of showing, either that it is an exercise of authority not legislative in its nature, or that it is inconsistent with some other provision of the Federal or State constitution.—Wynehamer v. People, 3 Kernan, 390, 411, 430, &c.; Sill v. Corning, 1 Smith's N. Y. 303; Sharpless v. Mayor, 21 Penn. 147; Commonwealth v. Maxwell, 27 Penn. 444-456; Clarke v. City of Rochester, 24 Barb. 480.

We are aware that the proposition has been sometimes asserted, that there are limitations upon the legislative power of the State governments, aside from, and inde-

pendent of, the constitutional restrictions to which we have adverted. Such unenacted limitations are sought to be deduced from the form and nature of the governments themselves, the objects which they were designed to accomplish, and the received political maxims and fundamental truths on which they are based. Nor is this view unsupported by the sanction of great names. Judge Chase, in Calder v. Bull, 3 Dallas, 386; Judge Story, in Wilkinson v. Leland, 2 Peters, 657; Judge Bronson, in Taylor v. Porter, 4 Hill, 145; Judge Strong, in People v. Toynbee, 20 Barb. 218; Judge Hosmer, of Connecticut, in Goshen v. Storlington, 4 Conn. 259; Chancellor Walworth, in Varick v. Smith, 5 Paige, 137; Judge Spalding, of Ohio, in Griffith v. Comm'rs, &c., 20 Ohio, 609; and Chief-Justice Parker, in Ross' case, 2 Pick. 169, have all, in terms more or less strong, intimated that the authority of the legislature is not absolute in all cases where the constitution has failed to impose an explicit restraint, but that there are other restrictions growing out of the fundamental principles of free government and the original rights of men; and several of these eminent judges have asserted it as an inherent prerogative of the judiciary, independently of constitutional provisions, to arrest the execution of any law which is contrary to the cardinal rules of justice or morality, or, as it is sometimes expressed, which is in conflict with common reason and natural right. See, also, People v. Supervisors, &c., 4 Barb. 64, 74; Benson v. Mayor, 10 Barb. 223; Hatch v. Verm't R. R., 25 Verm. 49; People v. Berberrick, 20 Barb. 230; Smith on Stat. & Const. Law, chap. 7; Ham v. McLaws, 1 Bay, 91; Bowman v. Middleton, ib. 250.

But these views are founded on notions of the extent of legislative · power in the abstract, and of the nature and function of the judicial office, which are, in our judgment, radically false. It must be remembered, that the very term *State* implies that there is somewhere a sovereign power whose only limit is its will—a power of that transcendant, supreme, illimitable nature, which, in the ascription of it to the English parliament, is described by

the strong word, *omnipotence.* In the United States, this absolute, uncontrollable power resides in the people of each State in the aggregate, as a separate and independent community. As it is expressed by Chief-Justice Gibson, " In every American State, the people in the aggregate constitute the sovereign, with no limitation of its power, and no trustee of it but its own appointee."—Kirby v. Shaw, 7 Harris, 258. All the powers, then, included in the omnipotence, which, under the English constitution, is ascribed to parliament, belong in our system to the people of each State in their collective capacity. Lord Coke says, " that the power and jurisdiction of parliament is so transcendent and absolute, that it cannot be confined, either for causes or persons, within any bounds."—4 Coke's Inst. 36. " So long as the English constitution lasts," says Blackstone, " we may venture to affirm that the power of parliament is absolute and without control."—1 Bla. Com. 162. Mr. Hallam says, that the absolute power of the legislature, in strictness, is as arbitrary in England as in Persia. And in a recent case, Lord Denman distinctly asserted the supremacy of parliament.—Stockdale v. Hansard, 11 Ad. & Ell. 253.

Though there are some loose expressions, in early cases, to the effect that statutes against common right are void, the modern doctrine clearly is, (and this is the logical result of the principle of parliamentary supremacy,) that an act of parliament, of which the terms are explicit, and the meaning plain, cannot be questioned, or its authority controlled, in any court of justice.—Stockdale v. Hansard, 11 Ad. & Ell. 253 ; 1 Kent, 408, 488. Indeed, there is no doubt that everywhere, except in the United States, the judicial is subordinate to the legislative power, and has no authority to annul an act of the latter when its meaning is plain.—Woodward v. Watts, 2 Ellis & Black. 457. This necessarily results from a principle, universal in the science of government, that, in the absence of institutional restrictions, the legislative power is subject to no limitations.

In Calder v. Bell, 3 Dallas, 386, Mr. Justice Iredell said : " If, then, a government, composed of legislative, execu-

16

tive, and judicial departments, were established by a constitution which imposed no limits on the legislative power, the consequence would inevitably be, that whatever the legislative power chose to enact would be lawfully enacted, and the judicial power could never interpose to pronounce it void." There is no room to doubt that our various State governments were organized with reference to this principle of the unlimited nature of legislative power in the abstract. Indeed, the object of the State constitutions was not so much to grant as to limit legislative power. The limitations they impose "are not so much limitations of the legislature, as of the power of the people themselves, self-imposed by the constitutional compact."—People v. Draper, 1 Smith,(N. Y.) 549.

The whole, unbounded legislative power of the people is granted to the general assembly, subject only to expressed exceptions. Without these exceptions, the power would be as unlimited as that of the people from whom it is derived. For the express reservation of a particular thing out of a general grant proves that the thing reserved would be within the general grant, had not the reservation been made.

Under our system, the power of the judiciary to arrest the operation of an unconstitutional law rests upon the familiar principle, recognized by courts everywhere, that when laws conflict in actual cases, the judge must decide which is the superior or paramount, and which the inferior or subordinate law. Written constitutions are, with us, the fundamental law; and to them acts of legislation must, in case of collision, yield. This is the foundation and the limit of the power of courts to annul an act of the legislature. If we go a step further, and assert their power to avoid such acts because they conflict with some law other than the written fundamental laws of the State and the Union, where shall we go to find it? Who are to settle the principles of eternal justice, and define the limits of so vague a thing as natural right?

If, while the legislature keeps within the written authority under which it acts, its proceedings are to be subject to the supervision and control of the judiciary,

who are thus to be allowed to deprive the general assembly of legislative powers not denied to it by the constitution, it may well be asked, and we know not where to find an answer, *quis custodiet custodes?* So long as the limitations of the constitution are not transcended, the wisdom, policy and justice of laws must be left to the discretion of the legislature; and an appeal from its discretion, to the discretion of the courts, is subversive of the first principles of free government. Lord Coke says, that 'in judicature discretion is a crooked cord.' Burke improved the saying by adding, that ' in legislation it is a golden rule.' The legislature is in direct communication with the people, and responsible to them; and if, while keeping within the limits which the sovereign power has prescribed for its action, it yet violates the abstract principles of justice, and disregards the boundaries of natural right, there is no remedy, save in the punitive power of public opinion, and the right of the people to change the representatives of their legislative sovereignty, and, through them, to repeal the obnoxious enactment.

Notwithstanding occasional intimations from eminent judges to the contrary, it may now be considered an established principle of American law, that while it is the duty of the judiciary to confine the legislative department within the constitutionally declared limits of its power, it has no right to set aside or annul a law, upon the mere ground that it conflicts with natural right, sound morality, or abstract justice.—Wynehamer v. People, 3 Kernan, 390, 411, 430, 452, 476; Town of Guilford v. Supervisors, &c., 3 Kernan, 143–5; Sharpless v. Mayor, 21 Penn. 147; Butler v. Palmer, 1 Hill, 324; Cochran v. Van Surley, 20 Wend. 380; Boston v. Cummins, 16 Geo. 102, 113; Stein v. Mayor, 24 Ala. 614; Bennett v. Boggs, 1 Bald. 74; Golden v. Rice, 3 Wash. C. C. R.; State v. Wheeler, 25 Conn. 290 (297;) Grant v. Courter, 24 Barb. 232, 237; Benson v. Mayor, &c., 24 ib. 248, 452–5; Clarke v. City of Rochester, 24 Barb. 446, 480, 489; People v. Draper, 25 Barb. 344, 359–60; People v. Collins, 3 Gibbs, 348–9; 1 Kent, 448; Doe v. Douglass, 8 Blackf. 10; Hamilton v. St. Louis County Ct., 15 Missouri, 23.

We stand, then, upon the proposition, that there are no limits to the legislative power of the State governments, save such as are written upon the pages of the State or Federal constitution.

Is there in the State constitution any provision, which, fairly construed, prohibits the enactment of the law before us? The act is obviously in the nature of legislative power, because it prescribes a rule of action for the people.—Sedgwick on Const. Law, 167–8; Smith on Const. Construction, 290–1. It cannot be assailed, therefore, as an assumption by the legislation of powers legitimately appertaining to either of the other departments of the government. Does it infringe any of those rights of the citizen, which, by the declaration of rights, are expressly excepted out of the grant of legislative power? By the 10th section of that declaration it is provided, that no person 'shall be deprived of life, liberty, or property, but by due course of law.' For the original of this we must look to the Great Charter of King John, where, as it stands in the English translation, it reads thus: "No freeman shall be taken, or imprisoned, or disseized, or outlawed, or banished, or any way destroyed; nor will we pass upon him, or commit him to prison, unless by the legal judgment of his peers, or unless by the law of the land." It was this particular clause of this ancient muniment of English freedom which drew from Lord Chatham his memorable saying, that ' *Magna Charta,* though rude in its Latin, was worth all the classics in the world.' In the subsequent charter of King Henry 3d, the same provison is found, in a form somewhat more comprehensive and specific.

The expressions, 'the law of the land,' 'due process of law,' and 'due course of law,' as found respectively in the English charters and in the various State constitutions in the United States, are substantially identical, and have always been held to mean a judicial proceeding regularly conducted in a court of justice, as contra-distinguished from statutory enactment. Any other construction would deprive the guaranty of all its force, and put the rights it was designed to protect at the mere mercy of the legisla-

ture.   If life, liberty and property could be taken away by the direct operation of a statute, the enjoyment of these rights would depend upon the will and caprice of the legislature, and the provision would be a mere nullity. Thus construed, the constitution would read, ' no person shall be deprived of his life, liberty, or property, unless the legislature pass a law to do so.'   A proposition so plain upon reason and principle hardly needs to be buttressed by authority   Chancellor Kent says, that "the better and larger definition of due process of law is, that it means law in its regular course of administration through courts of justice.—2 Kent, 13.   Chief-Justice Ruffin states the construction of these words with marked emphasis and directness—" The terms 'law of the land,' do not mean merely an act of the general assembly.   If they did, every restriction upon the legislative authority would be at an end."   *   *   " The clause itself means, that such legislative acts as profess in themselves directly to punish persons, or to deprive the citizen of his property without trial before a judicial tribunal, and a decision upon the matter of right, as determined by the laws under which it vested, according to the course, mode and usages of the common law as derived from our forefathers, are not effectually laws of the land for those purposes." Hoke v. Henderson, 4 Dev. 15.   Without now endorsing that part of the opinion just quoted, which implies that the trial *must* be ' according to the course, mode and usages of the common law,' it may be laid down, that an act of the legislature is not, and nothing less than a regular judicial trial is, ' due course of law' within the meaning of this clause of the constitution.—Taylor v. Porter, 4 Hill, 140 ; Jones v. Perry, 10 Yerger, 59 ; Fisher v. Mc-Girr, 1 Gray, 37 ; Embury v. Conner, 3 Coms. 511 ; Greene v. Briggs, 1 Curtis, 311 ; Wynehamer v. The People, 3 Kernan, 392, 425.

Does the 4th section of the act incorporating 'the Southern University,' deprive any citizen of his property in intoxicating liquors ?   The form in which the question is stated, assumes that spirituous liquors are property.   Of this there is no doubt, and we will not waste words upon

a proposition about which there can be no reasonable dispute.—3 Kernan, 384. All property is equally sacred in the view of the constitution. And hence we are not permitted to listen to a suggestion, that this particular species of property is so pernicious in its influences upon society, that the best interests of the State would be promoted by its destruction. The description of property to which this act refers, has nothing to do with this controversy; for a statute, depriving a citizen of his property in spirituous liquors, is just as clearly in conflict with the constitution, as one which should take from him his lands, houses, and slaves.

When, in the constitutional sense of these terms, is a citizen 'deprived of his property?' The answer to this question demands the ascertainment of that shadowy line separating regulation from destruction, which courts have found so much difficulty in defining, and which is, perhaps, destined forever to remain in the catalogue of disputed boundaries. The power to regulate, and the restriction on it not to destroy, though quite distinguishable when they do not approach each other, 'may yet,' (to borrow the striking illustration furnished by Chief-Justice Marshall,) 'like the intervening colors between white and black, approach so nearly as to perplex the understanding, as colors perplex the vision in making the distinction between them.' It is not surprising, therefore, that judges should have differed in their opinions upon a question, the intrinsic difficulties of which are so numerous.

We readily assent to the rule, that the constitutional provisions for the protection of life, liberty, and property, are to be largely and liberally construed in favor of the citizen. "A constitution," says Chief-Justice Gibson, "is not to receive a technical construction, like a common-law instrument, or statute. It is to be interpreted so as to carry out the great principles of the government, not to defeat them." The maxims of political ethics, and the fundamental principles of government, while they cannot be resorted to for the purpose of controlling the constitution, may yet be very properly kept in view, as guides or helps in the interpretation of it. It is right, therefore, to

read the provisions of the constitution designed for the protection of property, in the light of this plain maxim of political ethics, that the right of the citizen to his private property ought not to be interfered with by the State, except to satisfy the demand of some public exigency, or for the protection of life, liberty, or property itself. It is undoubtedly the duty of courts, to so construe the constitution as to make it conform, as nearly as possible, to this cardinal rule of civil polity. At the same time, we are not to wrest the words from the plain and obvious meaning which belongs to them; for that would be to alter the boundaries of the field which the people have declared the legislative power may occupy.—Hamilton v. St. Louis Co. Ct. 15 Missouri, 23.

It has been said, that an act of the legislature, prohibiting entirely the sale of an article whose commercial value depends mainly on its vendible quality, would, in the sense of the constitution, deprive a citizen then owning it of his property without due course of law. The line of argument by which this conclusion is reached, may be thus stated: The term *property*, although frequently applied to the thing itself, in strictness means only the rights of the owner in relation to it; and these are the rights of use, enjoyment, and disposal. These essential characteristics enter into every legal notion of property, and any article or thing eliminated of these attributes ceases to be property. To take away entirely the power of sale, although it does not physically destroy an article of merchandise, does annihilate the right which is its chief characteristic, and from which it derives its principal value. The property, in an article of merchandise which is shorn of its vendible quality, is, therefore, practically destroyed. The provision of the constitution must be supposed to have been made with reference to the known rights of possession, use and sale, incident to, and inseparable from property, and designed alike for the protection of all of them, especially of those without which it would be valueless. In addition to this, one of the purposes of instituting the government, as declared on the face of the constitution, was to "secure to ourselves,

and our posterity, the rights of life, liberty, and property."
And, inasmuch as any protection of property, chiefly
valuable as an article of commerce, which would leave
the owner completely stripped of the right to dispose of
it, would be merely nominal and illusory, it cannot be
supposed, that the words of this guaranty were used in a
sense so narrow and technical, as to authorize the legisla-
ture to take from such property its vendible quality, and
thus destroy the most important of the rights attached to
it.—3 Kernan, 396–7, 456; 20 Barb. 195–6, 216, 221.

On the other hand, it is declared to be an abuse of the
term, to say that a man is deprived of property, the pos-
session and use of which are left with him; that this pro-
vision has relation only to the title and possession of the
substance of property; that it was not designed to take
from the legislature the power to declare and limit the
uses to which property may be applied; that the exist-
ence of such a power in the legislature is essential to the
well-being of society, and is lodged with government in
all free states, and in every civilized country; that the
power to prohibit the traffic in articles deemed injurious
to the health or morals, or dangerous to the peace and
good order of society, belongs to the class of those police
powers which fall within the necessary functions of civil
government; and that it is derived, not from a narrow
interpretation of this constitutional guaranty, but from a
"principle of the common law older than constitutions,
and coeval with the earliest civilized ideas of property,
namely, that every man shall so use his own as not to
injure another, and especially that the use which he
makes of his property shall not work a public evil."

With great force it is said: "This provision has no ap-
plication whatever to a case where the market value of
property is incidentally diminished by the operation of a
statute, passed for an entirely different object, and a pur-
pose in itself legitimate, and which in no respect affects the
title, possession, personal use, or enjoyment of the owner.
*    *    *   *  Deprived is here used in its ordinary and
popular sense, and relates simply to divesting of, forfeit-
ing, alienating, taking away property. It applies to prop-

Dorman v. The State.

erty in the same sense that it does to life and liberty, and no other. * * * When a person is deprived of his property by 'due process of law,' the thing itself, as we all know, with the legal title, is taken away. All his rights in respect to it are entirely extinguished, and transferred with the *corpus* to another. The very language and subject, therefore, of the limitation upon the power, explain and define exactly the nature and character of the deprivation intended. * * * * The constitutional provision was intended to protect property from confiscation by legislative enactments, and from seizure, forfeiture, and destruction, without a trial and conviction by the ordinary modes of judicial proceeding."—Opinion of Justice T. A. Johnson, in Wynehamer v. People, 3 Kernan, 466–7.

The same judge places the argument on this side of the question in a strong light, by declaring, that it would be only a grave absurdity, "to hold that a statute which forbids a person selling an article of use and consumption, and renders it necessary for him to keep it for his own use and consumption, instead of selling it to others to be used or consumed by them, really takes it away from him, and deprives him of it contrary to the constitution."—3 Kernan, 469.

It is also said, that the word *deprived*, as used in this provision, is employed in the same sense, and is to receive the same construction, as the word *taken* in that provision which is common to all of our State constitutions, and which declares that private property shall not be taken for public use, unless compensation be made therefor.—Sharpless v. Mayor of Phila., 21 Penn. St. R. 147, (166;) Grant v. Courter, 24 Barb. 238.

" The word *take*," says Chief-Justice Black, "is one of the commonest and plainest in the language, and cannot be easily misunderstood, either by a lawyer or a layman. As used in the constitution, it has universally, in this State and elsewhere, been interpreted to mean a taking altogether, a seizure, a direct appropriation, dispossession of the owner."—21 Penn. R. 166; 23 Vermont, 361. If these positions are correct, it would follow that a citizen

cannot be said to be deprived of his property, when he is left in the undisturbed possession and personal enjoyment of it, though prohibited from selling it.—See 21 Penn. 167; Hooker v. Canal Co., 14 Conn. 146.

It is not to be denied, that the majority of the adjudged cases favor the proposition, that a statute which entirely prohibits the sale of spirituous liquors, does not, in the sense of this clause, deprive the owner of his property in them.—See the opinions of several of the judges in Wynehamer v. People, 3 Kernan, 435–6–8, 413–14, 442, 451, 466–7, 481; Fisher v. McGirr, 1 Gray, 26–7; Jones v. People, 14 Ills. 196; Goddard v. Jacksonville, 15 Ills. 588; People v. Hawley, 3 Gibbs, 330; Preston v. Drew, 33 Maine, 559; State v. Noyes, 10 Foster, (N. H.) 279; State v. Snow, 3 R. I. 68; State v. Peckham, 3 *ib.* 293; State v. Wheeler, 25 Conn. 290; Lincoln v. Smith, 27 Verm. 328; Sante v. State, 2 Clarke, (Iowa,) 165; State v. Gurney, 37 Maine, 149. See, also, Perdue v. Ellis, 18 Geo. 586; Intendant, &c. v. Chandler, 6 Ala. 899; 30 Ala. 461, 469; 28 Ala. 577.

But upon this question we expressly abstain from the expression of an opinion. The exigencies of the case before us do not demand that we should announce an opinion on this point, and we prefer to remain uncommitted. Wherever it has been asserted that a prohibition of sale is equivalent to deprivation, a total prohibition is meant, or one so nearly so as to show that the exceptions are merely colorable. The prohibition must be of such a character as, in effect, to annihilate, within the entire domain covered by the legislative authority, the quality of sale which makes the property valuable to the owner, and thus to sweep it, as an article of traffic, from the commerce of the State. If any substantial right of sale within the State is left untouched by the law, this, it is admitted, will save its validity. A law, less extensive in its inhibitions than such as is here referred to, might, by lessening the facilities and opportunities of sale, diminish the market value of the property, but would not entirely destroy any one of the known incidents attached to it; and the court would be bound to consider such an act as designed

for the regulation, not the destruction of property.
3 Kernan, *supra*, pp. 397, 399, 421, 456, 405, 435.

Waiving the consideration of the question, whether the
privilege reserved by the act, of selling for medicinal pur-
poses, is so trivial and insignificant as to be merely color-
able, (3 Kernan, 435–6,) and assuming that the act is to be
considered as tantamount to the absolute and unqualified
limitation of the sale of spirituous liquors within the lim-
its specified in the act, it is obvious that the entire domes-
tic market is not closed against the owners.   A substan-
tial and  valuable  right of sale within  the State is pre-
served.   The prohibitions of the law  cover a space  of
about eighty square miles—the rest of the State, embrac-
ing more than 50,000 square miles, is, with a few unimpor-
tant exceptions arising out of similar local enactments,
left as an open market for the sale of the property.

It has been said, with truth, that "the foundation of
the right of acquisition, alienation, and transmission of
property, is not in imaginary contracts, or a pretended
state of nature; but in their subserviency to the subsis-
tence and well-being of mankind."—Sir J. Mackintosh,
Law of Nature and Nations.   Man was born for society,
and with him the state of nature is the social state.
Property, and the rights incident to property, having
their origin in the exigencies of civil society, are properly
held in subordination to the necessities which give them
birth.   Hence it may be safely asserted, that the right to
dispose of property, as an absolute, unqualified, indefeas-
ble right, is one which has never existed since govern-
ments were organized among men.   It is a right which
has always been held subject to such regulations as, in the
judgment of the law-making power, the interests of soci-
ety required should be imposed upon it.—20 Barb. 179,
232; *ib.* 603.

In every well ordered State, property is held subject to
the tacit condition, that it shall not be so used as to
injure the equal rights of others, or the interests of the
community.   Such injurious uses of property may be pre-
vented by such regulations and restraints as the legisla-
ture may think proper to impose; and in the establish-

ment of these, the only limits to the legislative authority which we can recognize, are those which are declared by the written fundamental law.—Commonwealth v. Tewksbury, 11 Metc. 57; Commonw. v. Alger, 2 Cushing, 85; People v. Berberrich, 20 Barb. 232; Wynehamer v. People, 20 Barb. 603; Shelton v. Mayor, 30 Ala. 540; Mayor v. Yuille, 3 Ala. 137; 2 Kent, 340; License cases, 5 Howard, opinion of Woodbury, J.; State v. Wheeler, 25 Conn. 292, 297. Excise laws, retail and license laws, laws in relation to lotteries and lottery-tickets, laws for the regulation of taverns and public houses, sanitary laws, usury laws, Sunday laws, laws against perpetuities and for the registration of titles, are all so many illustrations of the principle, that the manner in which the owner of property shall hold, use and dispose of it, is a legitimate subject of legislative regulation.—Cases *supra*.

Upon this principle rests the power of the legislature to prohibit entirely the sale of spirituous liquors to minors and students. In the exercise of this undoubted power, the legislature is not confined to direct, but may adopt indirect measures of prohibition. The prevention of such sales to students attending an institution of learning, would doubtless be more effectually secured by prohibiting any sale of liquor within the limited space of country likely to be frequented by the students, than by the simple inhibition of its sale to the students themselves. Such a general prohibition of all sales would, it is true, injuriously affect the rights of some citizens in relation to their property. But the question, whether the public benefits to result from the prevention of intemperance among the students are entitled to more consideration than the personal inconveniences and losses to which third persons would be subjected by the denial of their accustomed right to sell spirituous liquors within the territory to which the act applies, is one of discretion, rightfully belonging to the legislature. With that question, we, as judges, have nothing to do, and about it we have nothing to say.

This law leaves the owner in the undisturbed possession of his property, at full liberty to use and enjoy it himself,

and the only place within a State embracing 50,000 square miles, at which he is by this act prohibited from selling it, is a small portion of a single county, in the immediate neighborhood of an important seat of learning. This is neither a confiscation of the *corpus* of the property, nor the annihilation of any one of the attributes with which it is invested by law and usage. Even upon the supposition that the exchangeable value of property is the property itself, this is, by the act before us, only diminished, not destroyed—the owner is injuriously affected in his right, but not deprived of it; and, as we have seen, it is one of the appropriate functions of legislation to determine when public necessity demands the sacrifice of individual convenience, and government cannot be restrained in the exercise of its legitimate powers because private rights will be thereby injuriously affected.

We do not perceive the force of the argument, that if this act is sustained as constitutional, the general assembly may, at different times, and under various pretenses, pass similar laws, until the entire area of the State is covered by enactments prohibiting the sale of this species of property. If such a general prohibition would be unconstitutional, we are bound to presume that the legislature will never attempt it. But it is sufficient to say, that the general assembly has not, in fact, done what it is suggested it may hereafter do. We are here to decide actual, not possible cases. All that we can, or ought to do, is to determine whether this particular law is constitutional. We are certainly not prepared to hold, that a legislature shall not exercise a constitutional power to any extent, because some succeeding general assembly may exercise it beyond the proper limit. That would be to say, that a lawful power must not be used at all, because it may be abused.

Our conclusion is, that this act does not deprive any person of his property, in the sense of the constitution. Nor are we able to perceive that it is in conflict with any other provision of that instrument.

By the 3d clause of the 8th section of the constitution of the United States, the power to regulate commerce

with foreign nations, among the several States, and with the Indian tribes, is delegated to congress. In pursuance of this power, congress has passed laws regulating the importation of liquors, fixing the duties to which they are subject, and the quantities in which they shall be imported. By these laws, malt liquors may be imported, in casks of not less than forty gallons, brandy in casks of not less than fifteen gallons, and other liquors in quantities of not less than ninety gallons.—Brightley's U. S. Dig. 359, § 166, 366, § 199. It is insisted, that the act under consideration is in conflict with these laws of congress, and therefore unconstitutional. The argument made is, that under these laws, the importer is clothed, not only with the right to bring liquors into the State in the quantities designated, but also with the right to sell them in the form or package in which they are imported; that this right of the importer is not arrested at the external boundary of the State, but enters its interior, and extends to every part of it; that by the terms of this act, no exception is made in favor of the importer, but the prohibition is general, including all persons, whether mere domestic dealers, or direct importers from foreign countries; and that this prohibitory clause not being susceptible of division, so as to separate the words which apply to the importer, from those which refer to the domestic dealer, the whole of this portion of the act is void.

In Brown v. The State of Maryland, 12 Wheaton, 419, Chief-Justice Marshall held, that the right to import includes the right to sell; and, consequently, that the laws of congress authorizing the importation of liquors in certain quantities, clothed the importer with the right to sell the same in the form in which they are imported, that is, in the original casks or packages; and that the State government could not deprive the importer of this right of sale, or burthen its exercise by requiring him to purchase a license to sell from the State authorities. But it was further held, that when the commodity had passed from the hands of the importer, into the hands of a purchaser, it ceased to be an import, or a part of foreign commerce, and became subject to the laws of the State,

Dorman v. The State.

and might be taxed for State purposes, or its sale regulated just as any other property. It was also said, that the power of congress to regulate commerce is co-extensive with the subject on which it acts, and cannot be stopped at the external boundary of a State, but must enter its interior.

The same principles were substantially announced by Chief-Justice Taney, in the license cases, 5 How. 572–6, and seem to have been approved in the main by a majority of the judges who delivered opinions in those cases. See the opinions of Justices McLean, Catron, and Nelson, 5 Howard, pp. 589, 601, 618.

But the proposition, that by virtue of the laws of congress the importer acquires a right to sell in the original packages, of which he cannot be deprived by State legislation, has been considered open to grave question, and was, in effect, distinctly repudiated by three of the judges in the license cases. (See the opinions of Justices Daniel, Woodbury, and Grier, 5 Howard, pp. 611, 618, 631.) By these judges the cases of Brown v. Maryland, *supra*, was not deemed an authority for such a rule, inasmuch as the question was not necessarily involved in that case. Nor in fact was it involved in the license cases; and it may be doubted whether it is not still open to discussion upon principle.—See Wynehamer v. The People, 20 Barb. 601.

However this may be, there is no doubt that each State has reserved the power to regulate its internal commerce. 9 Wheat. 195. Not only is this so, but all those powers which relate to merely municipal legislation, or what, perhaps, may be more properly called internal police, are reserved to the States; and, in relation to these, their authority is complete, unqualified, and exclusive.—City of New York v. Miln, 11 Peters, 102, 139; Gibbons v. Ogden, 9 Wheaton, 195, 203, 205, 208; 5 Howard, 574. Upon the retention by the States of these police powers rests the validity of all those quarantine, health and inspection laws, which have been uniformly sustained as constitutional, although they do, to some extent, interfere with and regulate foreign commerce. The inspection

laws authorize the detention and examination of merchandise; the quarantine laws direct possession to be taken of vessels, and require their cargoes and passengers to be stopped, and forbid intercourse with the shore; the health laws provide, in some instances, for the destruction of the cargo.—See 12 Wheaton, 443.

How far the State may go in the conservation of the health, morals, or safety of its citizens—what is the dividing line between a mere police law and a regulation of commerce—is a question of exceeding delicacy and difficulty. We take it for granted, that a State can undoubtedly prevent even an importer from selling intoxicating liquors upon the Sabbath, or to minors or slaves. Such a law, although it would incidentally, in one sense, regulate commerce, would, upon its face, be a police regulation, designed to protect the morals and good order of society. It would be the exercise of a power which the State has never surrendered, and without which it would have but meagre claims upon the respect and affection of its citizens. So the States may prohibit the sale of obscene books, or infected goods, imported from a foreign country, notwithstanding the duty may have been paid upon them, and they may remain in the original package.—5 How. 592, 581, 628, 631-2. See Holmes v. Jeamison, 14 Peters, 568; Gibbons v. Ogden, 9 Wheat. 203; City of N. Y. v. Miln, 11 Peters, 102, 133, 141-2; Passenger cases, 7 How. 524, 551.

There is certainly great force in the suggestion, that this provision in the charter of the Southern University must be considered as a mere police law, and not as a regulation of commerce; and that its validity should be sustained, even if it were shown that the defendant was an importer, and that the liquors were sold by him in the casks in which they were imported. This subject is ably discussed by Mr. Berrien, in his opinion as attorney-general, on the South Carolina police bill.—See 4th vol. Att'y Generals' Opinions, p. 432, &c. See, also, opinion of McLean, J. 5 Howard, p. 592.

But we need not place our decision on this ground. The argument made upon this point mistakes the princi-

ple applicable to such cases. A State law is not unconstitutional and absolutely void, because, in its practical operation, it may sometimes conflict with a law of congress passed in pursuance of the power to regulate commerce with foreign nations. If the provisions of the act be such that they may be assigned to a power not surrendered by the State, and have a legitimate field of operation without coming into collision with the law of congress, there is no doubt that, to that extent at least, they are a valid and constitutional exercise of power, and will be enforced. The most that has ever been said is, that whenever, in the enforcement of such a law, it is brought into actual collision with a law of congress passed in pursuance of the constitution, then, so far as the collision extends, but no further the law of congress excludes and displaces that of the State. The validity of the State law cannot be questioned, except by those who show that they have rights and privileges derived from an act of congress, of which they will be deprived if the law of the State is enforced against them.—5 How. 574, 585–6, 581–2, 589, 595–6, 601, 608, 619; 5 Wheat. 49–50; Passenger cases, 7 Howd. 552–3; State v. Peckham, 3 Rhode Island, 293; State v. Robinson, 39 Maine, 153; Duer's Const. Jurispr. 256–7; State v. Gurney, 37 Maine, 149.

The license cases, in 5 How. *supra*, illustrate this principle. The terms of the State laws there considered were as general as the words of this act. In neither one of the acts before the court was there an exception saving the rights of the importer; and the point was made in the argument by Mr. Webster and the other counsel, that by the terms of the laws, even the importer was prohibited from selling, and that consequently the acts were unconstitutional.—*Ib.* p. 502, 538, 515, 535. But in neither of the cases was it shown that the defendant was an importer, and he was, therefore, not in a condition to insist that the State law should yield to those of the Federal government, which clothe an importer with the right to sell. See 5 How. *supra;* also, State v. Gurney, 37 Maine, 149; State v. Robinson, 39 Maine, 153–4.

The power to regulate commerce with foreign nations

17

is not so exclusive in congress, as to prevent all State legislation upon the subject. It belongs to the class of concurrent powers; and every such power may be exercised by the State, subject to the single limitation that, in the event of actual collision, the law of congress prevails, and the State law ceases to operate; but only so far as the collision extends.—City of N. Y. v. Miln, 11 Peters, 102; Commonw. v. Kimball, 24 Pick. 359; Commissioners, &c., v. Steamboat Cuba, 28 Ala. 185, 197; Freeman v. Robinson, 7 Inda. 321; Newport v. Taylor, 16 B. Mon. 699; Weaver v. Fegley, 29 Penn. 27; Cooley v. Board of Wardens, 12 Howard, 299, 318; Houston v. Moore, 5 Wheat. 1.

It does not appear that, in the application of this act to the defendant, any collision has taken place with the laws of congress. He has therefore no right to call upon us to arrest its execution.

2. The demurrer to the indictment should, however, have been sustained, if for other reason, because it failed to name or in any way describe the person to whom the liquor was sold. Francois v. State, 20 Ala. 84; Brown v. Mayor of Mobile, 23 Ala. 722; Starr v. State, 25 Ala. 38. The provisions of section 1059 of the Code have no application to a prosecution founded on the special act under which this indictment was found, and the general form there prescribed is not sufficient in such a case.—Camp v. The State, 27 Ala. 53.

The judgment is reversed, and the cause remanded.